IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

_____AT JACKSON

SEPTEMBER 1995 SESSION

FILED

November 24, 1997

Cecil Crowson, Jr.
Appellate Court Clerk

| | | |
|---|---|---|
| STATE OF TENNESSEE, | ) | |
| | ) | C.C.A. NO. 02C01-9405-CR-00089 |
| Appellee, | ) | |
| | ) | |
| | ) | Shelby County |
| v. | ) | |
| | ) | Honorable Joseph B. McCartie, Judge |
| FREDRICK SLEDGE, | ) | |
| | ) | (Capital First Degree Murder and |
| Appellant. | ) | Especially Aggravated Robbery) |

For the Appellant:_____        For the Appellee:

William P. Redick                                Charles W. Burson
Capital Case Resource Center                     Attorney General and Reporter
704 - 18th Avenue South                          450 James Roberston Parkway
Nashville, TN 37203                              Nashville, TN 37243-0497
(ON APPEAL)                                              and
                                                 Sharon S. Selby
Paul Bottei                                      Assistant Attorney General
Capital Case Resource Center                     450 James Roberston Parkway
704 - 18th Avenue South                          Nashville, TN 37243-0497
Nashville, TN 37203
(ON APPEAL)                                      John W. Pierotti
                                                 District Attorney General
                                                        and
Edwin C. Lenow                                   John Campbell and
Suite 2325                                       Jerry Harris
100 North Main Building                          Assistant District Attorneys General
Memphis, TN 38103                                201 Poplar Avenue
(AT TRIAL)                                       Memphis, TN 38103

OPINION FILED:_____

FIRST DEGREE MURDER CONVICTION AFFIRMED, SENTENCE REVERSED,
REMANDED FOR NEW SENTENCING TRIAL.

ESPECIALLY AGGRAVATED ROBBERY CONVICTION AND SENTENCE AFFIRMED.

Joseph M. Tipton
Judge

# O P I N I O N

The defendant, Fredrick Sledge, was convicted by a jury in the Shelby County Criminal Court of first degree murder and especially aggravated robbery, a Class A felony. In the capital sentencing hearing, the jury found the existence of one aggravating circumstance: that the defendant had been previously convicted of one or more felonies, whose statutory elements included the use of violence to the person. See T.C.A. § 39-13-204(i)(2). The jury found that the aggravating circumstance outweighed the evidence of mitigating circumstances beyond a reasonable doubt and sentenced the defendant to death by electrocution. He received a twenty-year, consecutive sentence for the especially aggravated robbery.

In this appeal as of right, the defendant alleges deficiencies and errors that occurred from indictment insufficiency and trial errors to the constitutionality of the death penalty, the particulars being specified through this opinion. Having considered the various claims, we conclude that the conviction for felony murder is affirmed but that sentencing phase trial errors require us to reverse the sentence and to remand the case to the trial court for resentencing for first degree murder. We affirm the conviction and sentence for especially aggravated robbery.

## BACKGROUND

The evidence presented at trial established that the victim, Johnny Harris, was killed in Memphis, Tennessee, on the evening of December 10, 1991. Dr. O'Brian C. Smith, Assistant Medical Examiner for Shelby County, performed the autopsy on the body the following morning. The autopsy revealed two gunshot wound tracks completely through the body. One bullet entered the left back, went through the heart, and came out of the chest. The other was in the back of the left knee, and it came out just below the kneecap.

2

Dr. Smith testified that the wounds were distant wounds, that is, the gun was shot from more than two feet away from the victim. Dr. Smith could not determine exactly how far away the victim was from the gun, but there was no powder residue on the victim's hands, which he said would tend to indicate the victim did not grab the gun when it was discharged.

The bullet that entered the back and went through the heart caused the death. Dr. Smith testified that the wound to the knee was consistent with a person whose leg was in a running motion when it was hit. He also testified that the bullet track in the back was consistent with a person bending forward, as in a running position. However, Dr. Smith acknowledged that the bullet tracks could also indicate that the shooter was positioned on a lower plane than the victim when the gun was fired.

Officer Sandra D. Palmer of the Memphis Police Department was the first officer at the scene, an apartment complex on 2240 Union Avenue. She received a dispatch and arrived at 10:57 p.m. Officer Palmer testified she saw a white male lying on his back, face up, pockets turned inside out, and bleeding from the chest area. The victim lived in apartment 19, but the body was lying in front of apartment 21. The victim's car was parked in front of apartment 19, and on the ground next to the car on the driver's side were some of the victim's personal belongings. There is an alley that runs parallel to the front of the apartment building, between the alley and the building are the parking spaces. Each apartment has two adjacent doors leading inside.

Officer Palmer saw no blood or shell casings in the area between the body and the items on the ground next to the car. The only blood she saw was on the ground next to the victim.

3

Officer Dana Stine of the Memphis Police Department was the patrolman responsible for the collection and preservation of the evidence at the scene. He took photos, dusted for prints, drew sketches, and collected and tagged the victim's personal belongings that were retrieved from the parking lot next to the driver's side of the victim's car and from the front seat of the car. Officer Stine recovered fingerprints from the victim's wallet and box cutter, but he was unable to get any prints from the victim's car. Officer Stine testified that because the victim's pants pockets were turned inside out, "it kind of appeared like he had to clean out his pockets or something like that." The victim did, however, have a gold necklace visibly hanging around his neck.

Officer Stine found four distinct bullet holes in the two doors leading into apartment 21, but he could only find three of the bullets. One spent bullet was still in one of the holes, while the two other bullets were inside the apartment, one in a mattress and one in a wall. He testified that both bullets found inside the apartment were traveling in an upward direction before they came to rest. He could not, however, determine the direction of travel of the bullet found in the outside door.

Officer Stine also took measurements of the scene. The victim's body was thirty-three feet away from the items found next to the car. There is a sixteen-inch rise from the ground level of the parking lot to the porch in front of apartment 21 where the body was lying. The alley is about thirty feet from the front of the building, and the alley has about a two-foot incline to the parking lot.

The State called three witnesses who were living in the apartment complex on the night of the murder. The first, James Falls, lived in apartment 21. Mr. Falls testified that he heard gunfire around 10:45 p.m. At first, he thought it was a car backfiring, but then he saw the bullets come through his apartment doors. Mr. Falls testified that he went to the floor and yelled to his wife to get onto the floor. He crawled

4

to the kitchen and called 911. He testified that he did not look outside until the police arrived, but when he did look, he saw the victim lying on his front porch.

Clifford Anderson, another apartment resident, testified that he was on the Union Avenue side of the complex heading towards a convenience store at about 10:45 p.m. when he heard gunshots coming from the rear of the building. Mr. Anderson testified that he saw a man standing on a second floor balcony of the apartment building and thought that he might have been involved, but he did not see anything in his hands. Mr. Anderson then saw what appeared to be a male with a long black or brown trench coat and a short Afro or hat running in the alley behind the building towards Edgewood. He did not see the man carrying anything in his hands.

After he saw this man running, Mr. Anderson testified that he saw an early 1970's model blue Buick containing two or three people drive down Edgewood and make a left heading east onto Union Avenue. He said that he saw the car moments after he saw the person running down the alley, and that the timing of the events led him to believe that the person he saw running had possibly gotten into the car. The car appeared to drive off at a normal rate of speed. After the car drove away, he called the police.

Darrell Hubbard lived on the second floor in apartment 44. He testified that on the night of the murder he heard five gunshots: first there was one, then a pause, then the other four were rapid. Mr. Hubbard looked out of his window and saw a person with white shoes, black pants, and a long black coat, with his hands in his pockets, running down the alley towards Edgewood. Mr. Hubbard testified he saw the person's face when the person appeared to be startled by something in the alley and turned around and looked back in Mr. Hubbard's general direction. Mr. Hubbard was about twenty to thirty feet away from the person. When he talked to the police that

5

night, he told them that it appeared the person had a stocking on his head and that he would be able to identify the person if he were wearing the same clothes as he had on that night. At the trial, however, he testified that it appeared that night like the person had on a stocking because he was looking at the person through the screen in his window. While on the witness stand, Mr. Hubbard identified the defendant as the person in the alley.

On December 18, 1991, the defendant gave a statement to the police concerning the murder of Mr. Harris. Sergeant Richard David Roleson and Sergeant Ronald F. Wilkinson both advised the defendant of his rights before conducting the interview. Sergeant Wilkinson said that the defendant understood his rights, signed a waiver form, and agreed to answer questions from the officers. He also testified that at the time of the interview, the defendant seemed alert and did not appear to be under the influence of any narcotics or alcohol.

The following is a summation of the statement the defendant gave to Sergeants Wilkinson and Free of the Memphis Police Department:

> The defendant admitted to shooting someone with a revolver in some apartment complex on December 10, 1991. When asked why he shot the person, the defendant stated that the man grabbed his gun and he was scared. He admitted he was in the process of robbing the victim when he shot him.

> The defendant was at a friend's apartment with two other individuals, Antonio Crawford and Alex Bumpus, when the three of them decided to borrow a friend's Buick and go out and rob somebody in the mid-town area. They spotted an old man, about 5'6" tall, coming out of the Mega Market and trailed him to his apartment.

> When they arrived at the man's apartment building, the defendant got the gun from Crawford in the front seat, got out of the car, and followed the man into an alley. The defendant was wearing Crawford's long black coat. He was holding the gun down to his side and approached the man and told the man to give him all his money. The man gave the defendant his billfold. The billfold contained only six or seven dollars and some sort of badge. The defendant asked the man if he was a cop or something, but the man just stood there without

6

speaking. The defendant then went through the man's pockets, saying "this ain't all the money you got, I know it ain't."

While he was going through the pockets with his right hand, he held the gun in his left hand. The defendant kept asking the man if he had more money, but the man still did not say anything. After he searched the pockets, the defendant patted the man's clothing. The man then grabbed the gun and the gun went off. The defendant did not know if the man was hit.

The defendant walked away and saw that the man was following him, so the defendant shot away from him to scare him off. He thinks he fired the gun three or four times. The defendant then took off running. The defendant stated, "I thought I was shooting away from him, and I must have hit him, I didn't see nothing, to make sure he don't follow me." When he got back in the car, he gave the gun back to Crawford. The other two individuals asked whether he shot the guy. The defendant replied he did not know, but hoped he did not.

The defendant stated that he did not tell anyone else about the shooting, but stated that Crawford and Bumpus told their cousin Lisa they had robbed some old man, the defendant fired the gun, but they did not know whether the man was hit. The defendant also stated that he had robbed about four or five other people in Memphis. Finally, the defendant stated he was not trying to shoot the old man and he is sorry the man died.

The 1977 blue Buick the defendant and the other two were using on the night of the murder belonged to Davey Weeks. Kimberly Farmer borrowed the car from Mr. Weeks and then allowed Crawford, Bumpus, and the defendant to use it that evening. Ms. Farmer testified that the defendant was wearing black jeans and a long black coat, and that he had a gun in his coat pocket when they went out. She further testified that she saw the three men return no later than 11:00 p.m. that evening. When the three men returned, she overheard the defendant say, "he don't need his business discussed with no bitch and everybody needed to shut up before he killed everybody that's conversating about him." Ms. Farmer also testified that the defendant said he would kill whoever snitched to the police about him. Ms. Farmer testified that when she talked to the defendant several days afterwards about the police looking for him, the defendant's reaction was normal; he did not care.

7

Nick A. Dodys, the victim's nephew, testified on behalf of the state. His testimony consisted only of personal information about the victim. The victim was 64 years old, about 5'6" tall, and in excellent health. He was retired from the restaurant business, and at the time of his death worked part-time as a butcher at a Mega Market. At one time he also worked in vehicle storage for the Memphis Police Department. The victim lived with and took care of his mother, and after her death he lived alone. Mr. Dodys testified that he and his mother, the victim's sister, would talk to the victim about twice a day, including the afternoon of the day of his death. Mr. Dodys testified that he attended his uncle's funeral.

The defense called no witnesses in the guilt phase of the trial. The defendant was convicted on the above evidence.

During the sentencing phase, Carolyn Rudolph, Clerk for the Shelby County Criminal Court, was called by the state to testify concerning the defendant's previous convictions. The defendant robbed a couple on December 13, 1991, only days after the robbery in the present case, and was convicted for those crimes on February 23, 1993. The victims of the other crimes were Yvette and Gary Yochum.

Mr. Yochum testified on behalf of the state. Mr. Yochum and his wife had pulled into their driveway when the defendant confronted them with a gun demanding all their money. Mr. Yochum testified that the defendant said, "give me all your money, or I'll kill you." After Mr. Yochum and his wife gave him all they had, the defendant approached them and went through their pockets. The defendant told them to lie down, but because of the car's position against the fence they could not. Mr. Yochum testified that a shot was fired and then the defendant fled. No one was hurt.

8

The defense attempted to introduce the testimony of Carl Nelson as mitigating evidence. After a lengthy leave into Mr. Nelson's credentials, though, Mr. Nelson never testified. The court stated that the defense never established Mr. Nelson's expertise in the field to which he was to testify: psychology. At the time of the trial, Mr. Nelson was employed by the state as a Psychological Chaplain II. He has a bachelor's degree in social psychology and a master's in pastoral counseling. Mr. Nelson testified that he had performed thousands of psychological evaluations on inmates in Tennessee over the previous eight years through a test he developed himself. Mr. Nelson testified that he had met with the defendant for about an hour on three different occasions, and in order to assess the defendant's upbringing, even moved into the defendant's housing development for eight months.

The defense wanted to elicit testimony from Mr. Nelson concerning the defendant's remorsefulness. The court, however, stated that he was not qualified as a psychologist. The court ruled that Mr. Nelson would only be allowed to testify about interviews he had with the defendant, but that he could not testify as to any opinions he formed. At one point during the questioning, the topic of racism surfaced. The transcript indicates that the witness was attempting to interpose theories concerning the socialization of African-American males. The trial court asked the witness several times what he meant by such statements. The witness appeared to be skirting around the trial court's questions, and the trial court finally said that Mr. Nelson could not testify and asked the witness to step down.

The next morning, however, the trial court told the defense that Mr. Nelson would be allowed to testify, but that his testimony would be limited to his interviews with the defendant and not as to any opinions he formed. The defense, however, was unable to reach Mr. Nelson, and Mr. Nelson never testified.

9

The defendant testified on his own behalf during the sentencing phase. He testified that he never intended to strike Mr. Harris and that he is sad about what happened. On cross-examination, the defendant stated that he was not shooting at Mr. and Mrs. Yochum, but that the gun fired accidentally. He said he was not aware that Mr. Harris was shot until the police told him. The defendant denied telling anyone that he would kill them if they talked about him.

## SUFFICIENCY OF THE INDICTMENT

In his first issue, the defendant challenges the sufficiency of the indictment. Specifically, the defendant claims that the felony murder count is fatally defective and void because it fails to allege the mental state required for a killing to result in the offense of felony murder. The state contends that this issue has been waived. Alternatively, the state asserts that the indictment correctly charges the offense.

As a general proposition, defenses and objections based on defects in the indictment must be raised before trial. Tenn. R. Crim. P. 12(b)(2); State v. Randolph, 692 S.W.2d 37, 40 (Tenn. Crim. App. 1985). If the defendant fails to raise the issue before trial, the issue is deemed to be waived. Tenn. R. Crim. P. 12(f); see Rhoden v. State, 816 S.W.2d 56, 61 (Tenn. Crim. App. 1991).

However, Rule 12(b)(2) expressly states that jurisdictional defects or the failure to charge an offense "shall be noticed by the court at any time during the pendency of the proceedings." If the indictment does not charge an offense, Tenn. R. Crim. P. 34 permits an arrest of the judgment if "filed within thirty days of the date [of] the order of sentence . . . ." Moreover, our rules require that we determine "whether the trial and appellate court have jurisdiction over the subject matter," even though the

issue might not have been presented as a ground for relief. T.R.A.P. 13(b). See State v. Seagraves, 837 S.W.2d 615, 617-18 (Tenn. Crim. App. 1992).

In State v. Perkinson, 867 S.W.2d 1 (Tenn. Crim. App. 1992), the defendants were convicted of conspiracy to commit first degree murder. On appeal, they claimed that the conspiracy indictment was legally insufficient because it did not allege an overt act, one of the statutory elements of the crime. The appellants failed to raise the issue before trial. In holding the indictment to be void, this court noted that "the waiver rule does not apply when the indictment fails to assert an essential element of the offense. In that circumstance, no offense has been charged. In consequence, subsequent proceedings are a nullity." Id. at 6. A lawful accusation is an essential jurisdictional element without which there can be no prosecution. State v. Hughes, 212 Tenn. 644, 371 S.W.2d 445, 447 (Tenn. 1963). Moreover, "[c]onviction upon a charge not made would be a sheer denial of due process." De Jonge v. Oregon, 299 U.S. 353, 362, 57 S. Ct. 255, 259 (1937).

Accordingly, we are not prevented from reviewing this issue on appeal when the defendant failed to raise the issue in a pretrial motion. See Seagraves, 837 S.W.2d at 618 (issue pertaining to indictment properly before this court even though issue not raised in motion before trial). Nor are we prevented from reviewing the issue when the defendant did not raise the issue in his motion for new trial. T.R.A.P. 3(e) provides that:

> no issue presented for review shall be predicated upon error in the admission or exclusion of evidence, jury instructions granted or refused, misconduct of jurors, parties, or counsel, or other action committed or occurring during the trial of the case, or other ground upon which a new trial is sought, unless the same was specifically stated in a motion for a new trial.

(Emphasis added). Because the issue relating to the sufficiency of the indictment would involve vacating the conviction rather than a new trial on the charge, we may properly review it. State v. Sowder, 826 S.W.2d 924, 926 (Tenn. Crim. App. 1991);

11

State v. Davis, 748 S.W.2d 206, 207 (Tenn. Crim. App. 1987); see also State v. Keel, 882 S.W.2d 410, 416 (Tenn. Crim. App. 1994).  Also, as noted in Seagraves, 837 S.W.2d at 618, this type of issue is plain error on the face of the record.  See Tenn. R. Crim. P. 52(b).

Count one of the murder indictment in this case reads, in pertinent part, as follows:

> THE GRAND JURORS of the State of Tennessee, . . . present that FREDRICK SLEDGE . . . on December 10, 1991, in Shelby County, Tennessee, and before the finding of this indictment, did unlawfully kill JOHNNY HARRIS during the perpetration of Aggravated Robbery, in violation of T.C.A. 39-13-202, against the peace and dignity of the State of Tennessee.

(Emphasis added).  The defendant was convicted of felony murder.

At the time of the offense in this case, this means of committing first degree murder was defined as "[a] reckless killing of another committed in the perpetration of, or attempt to perpetrate any . . . robbery . . . . "  T.C.A. § 39-13-202(a)(2) (1991) (emphasis added).[1]  The defendant argues that because the mens rea then required for the offense, i.e., "reckless," was not included in the indictment, the trial court lacked power to enter judgment against the defendant.  In response, the state asserts that the indictment complies with applicable statutory and case law requirements.

T.C.A. § 40-13-202 provides that:

> The indictment must state the facts constituting the offense in ordinary and concise language, without prolixity or repetition, in such a manner as to enable a person of common understanding to know what is intended, and with that degree

---

[1] We note that the form indictment for felony murder developed by the Tennessee Sentencing Commission for recommended use under the 1989 criminal code changes includes the allegation of a reckless killing.  See Pattern Indictments, Tennessee Sentencing Commission, page 12, (Jan. 1991).  The introduction to that publication notes that the "basic wording and the majority of the work" in preparing the forms was done by the Shelby County District Attorney General's office.

of certainty which will enable the court, on conviction, to pronounce the proper judgment . . . .

Also, in Perkinson, this court stated the following:

> The provisions of both the Federal and Tennessee Constitutions guarantee the criminally accused knowledge of the "nature and cause of the accusation." U.S. Const. amend. VI; Tenn. Const. art. I, § 9. In order to comply with these constitutional guidelines, an indictment must provide notice of the offense charged, adequate grounds upon which a proper judgment may be entered, and suitable protection against double jeopardy. State v. Pearce, 7 Tenn. 65, 67 (1823); State v. Byrd, 820 S.W.2d 739 (Tenn. 1991). When the indictment fails to fully state the crime, all subsequent proceedings are void. State v. Morgan, 598 S.W.2d 796, 797 (Tenn. Crim. App. 1979).

867 S.W.2d at 5. In State v. Smith, 612 S.W.2d 493, 497 (Tenn. Crim. App. 1980), this court stated that "the test for the sufficiency of an indictment is whether it contains the elements of the offense intended to be charged [and] sufficiently apprises the defendant of what he must be prepared to meet." See also Warden v. State, 381 S.W.2d 244, 245 (Tenn. 1964); Inman v. State, 259 S.W.2d 531, 532 (Tenn. 1953). "When the indictment fails to fully state the crime, all subsequent proceedings are void." Perkinson, 867 S.W.2d at 5.

In State v. Roger Dale Hill, Sr., No. 01-S-01-9701-CC-00005, Wayne County (Tenn. Nov. 3, 1997) (for publication), our supreme court stated the following:

> We hold that for offenses which neither expressly require nor plainly dispense with the requirement for a culpable mental state, an indictment which fails to allege such mental state will be sufficient to support prosecution and conviction for that offense so long as
>
>> (1) the language of the indictment is sufficient to meet the constitutional requirements of notice to the accused of the charge against which the accused must defend, adequate basis for entry of a proper judgment, and protection from double jeopardy;
>>
>> (2) the form of the indictment meets the requirements of Tenn. Code Ann. § 40-13-202; and
>>
>> (3) the mental state can be logically inferred from the conduct alleged.

13

Slip op. at 3. The court also noted that "[i]n modern practice, it is unnecessary to charge guilty knowledge unless it is included in the statutory definition of the offense." Slip op. at 9. We read Hill to mean that the fact that the reckless mens rea was specifically stated in the felony murder statute at that time requires that it be particularly included in an indictment charging felony murder.

The state asserts, though, that the use of the word "unlawfully" sufficiently supplies the mens rea that would necessarily equate with "recklessly." It argues that "unlawfully" reflects that not every killing in a course of a felony will result in criminal liability, but only those prescribed by law, i.e., where the killing is done intentionally, knowingly, or recklessly. However, the statute to which the state refers regarding culpable mental states, T.C.A. § 39-11-301 (1991), does not even contain the word "unlawfully," but contains another culpable mental state that the state ignores in its reliance on the meaning of "unlawful": criminal negligence, which is a lesser culpable mental state than reckless. Thus, the state's argument actually suggests that the defendant could have been "criminally negligent" and still be convicted of felony murder. This, of course, is erroneous.

In State v. Hughes, our supreme court held that because driving to the "left across a yellow stripe" is not always a violation of the law, such an allegation in an indictment fails to state an offense. 212 Tenn. at 649, 371 S.W.2d at 447. Similarly, in the present case, while count one of the murder indictment alleges that the defendant did "unlawfully kill" the victim during the perpetration of an aggravated robbery, the allegation does not exclude a killing committed through criminal negligence. Thus, with "reckless" being but only one of the several legally recognized culpable mental states, there can be no logical or necessary implication from the inclusion of the qualifying term "unlawfully" that the killing was done with the requisite "recklessness."

14

The state also asserts that count one was meant to charge the defendant with felony murder as noted by the citation in count one to T.C.A. § 39-13-202, the first degree murder statute. However, in State v. Marshall, 870 S.W.2d 532, 537 (Tenn. Crim. App. 1993), this court stated that "a reference to a criminal statute should not suffice in terms of replacing the necessary factual elements" required to be alleged by T.C.A. § 40-11-202.

Count one of the murder indictment in the present case fails to include an allegation of recklessness for the killing alleged. Accordingly, felony murder was not sufficiently charged in count one.[2] However, this conclusion does not end our inquiry. The murder indictment also contains in count two allegations that the defendant unlawfully, intentionally, premeditatedly, and deliberately killed the victim.

We note that our criminal code prohibits the offense of first degree murder, although it lists several means by which the offense may be committed. Thus, whether a finding of guilt is made for a felony murder or a premeditated and deliberate one, the offense committed is the same, first degree murder.

Historically in Tennessee, an indictment alleging that the defendant unlawfully, willfully (intentionally), maliciously, premeditatedly and deliberately killed the victim has been deemed sufficient to sustain a conviction for first degree murder upon proof of felony murder. See Sullivan v. State, 173 Tenn. 475, 483, 121 S.W.2d 535, 537 (1938); State v. Johnson, 661 S.W.2d 854, 860-61 (Tenn. 1983); Tosh v. State, 527 S.W.2d 146, 148 (Tenn. Crim. App. 1975). Compare Schad v. Arizona, 501 U.S. 624, 642-46, 651, 111 S. Ct. 2491, 2502-03, 2507 (1991) (historical use of felony

---

[2] The pre-1989 felony murder statute did not require a separate mens rea for the killing. See T.C.A. § 39-2-202 (1982). Consequently, an indictment such as the one in the present case would be valid under that statute. See, e.g., State v. Giannini, No. 36, Shelby County (Tenn. Crim. App. June 12, 1991), app. denied (Tenn. Nov. 12, 1991). In fact, effective for crimes committed on or after July 1, 1995, our statutes no longer require a mens rea for the killing involved in a felony murder. See T.C.A. § 39-13-202(a)(2).

murder and premeditated murder as alternative, equivalent means of committing single crime of first degree murder renders inconsequential for constitutional purposes the fact that jury returned a general verdict, with no indication that it agreed upon which form of murder occurred). This means that, as a matter of law, count two of the murder indictment alleging a deliberate and premeditated killing suffices for felony murder, as well. Thus, regardless of the validity of count one, the defendant was lawfully charged with first degree murder in count two, even if the means proven was by felony murder.

We acknowledge that the state, in practice, has usually brought two counts of first degree murder when the commission of or attempt to commit a felony specified in the first degree murder statute has been involved. Such is obviously what occurred in the present case. Although this results in an indictment that could be deemed multiplicitous -- charging the same offense in separate counts -- it provides specific notice of the particular acts and means of murder upon which the state relies and allows for, in effect, specific findings from the jury. This is of particular value in a capital case in light of State v. Middlebrooks, 840 S.W.2d 317 (Tenn. 1992). Thus, although count one of the murder indictment in the present case may have been deficient in its allegations, we cannot ignore the fact that count two constituted a valid charge of first degree murder.

Moreover, we do not believe that the verdict returned by the jury is subject to question as a legitimate finding of guilt under the facts and the law. The trial court's instructions to the jury for felony murder was, in pertinent part, as follows:

HOMICIDE: FIRST DEGREE MURDER
(KILLING IN PERPETRATION OF OTHER CRIMES)

A person who commits first degree murder is guilty of a felony.

For you to find the defendant guilty of this offense, the state must have proven beyond a reasonable doubt the existence of the following essential elements:

(1) that the defendant unlawfully killed the alleged victims; and

(2) that the killing was committed in the perpetration of or the attempt to perpetrate the alleged Aggravated Robbery; that is, that the killing was closely connected to the alleged Aggravated Robbery and was not a separate, distinct and independent event; and

(3) That [sic] the defendant intended to commit the alleged Aggravated Robbery; and

(4) that the killing was the result of a reckless act by the defendant.

This was followed by definitions of intentionally, knowingly, and recklessly. These instructions constituted a correct statement of the specific requirements for a finding of felony murder. Thus, the jury's consideration of the evidence was pursuant to the proper law regarding first degree murder by means of a reckless killing during the perpetration of or the attempt to perpetrate robbery. With the evidence presented and the instructions given, we believe that the jury verdict represents a proper finding.

The problem in this case is that the trial court's instructions pretermitted any return of a verdict directed to count two, once the jury found the defendant guilty of felony murder. Preliminarily, we note that the sequential, alternative verdict requirement used by the trial court was unnecessary as a matter of law because, upon proper instructions, findings as to both counts would not violate any right of the defendant, but would provide specific findings by the trier of fact which would aid in determining how the sentencing phase should proceed in light of Middlebrooks. See James David Carter v. State, 03-S01-9612-CR-00119, Greene County, slip op. at 11

17

n.6 (Tenn. Oct. 20, 1997) (for publication). Obviously, two guilty verdicts for the same first degree murder would only result in one judgment of conviction for first degree murder, but there would be no need to ignore or, in effect, lose either finding represented by a guilty verdict by dismissing one of the two counts.

We are aware that the supreme court has "vacated" a "conviction" for felony murder in such a circumstance. See State v. Hurley, 876 S.W.2d 57, 70 (Tenn. 1993). We are also aware that this court has previously stated that guilty verdicts for felony murder and premeditated and deliberate murder, charged in separate counts but for the same crime, should lead to one of the "convictions" being vacated or stricken.[3] See State v. Perry A. Cribbs, No. 02C01-9508-CR-00211, Shelby County, slip op. at 36-37 (Tenn. Crim. App. Feb. 14, 1997). In Cribbs, this court concluded that the concept of merger relates only to lesser included offenses and that felony murder and premeditated and deliberate murder are not a lesser of each other.

From our perspective, though, we do not believe that the supreme court in Hurley intended for a dismissal to be the only legitimate option available. Likewise, we believe that Cribbs overlooked the fact that when only one killing is involved, the two counts are for the same offense -- first degree murder. The fact that each count alleges a different means of committing the same offense does not render them separate. Moreover, there is no need to "dismiss," "vacate," or "strike" a properly returned jury verdict, which should continue to stand as a legitimate finding of fact. Rather, the trial court should seek to preserve proper jury findings by merging the same offense counts into one judgment of conviction for that offense.

---

[3] A judgment of conviction is the legal instrument that includes the sentence and through which the executive branch may enforce punishment. See Tenn. R. Crim. P. 32(c); State v. Vasser, 870 S.W.2d 543, 546 (Tenn. Crim. App. 1993). Apparently, the "convictions" in Hurley and Cribbs refer to the guilty verdicts.

18

Under such circumstances, a merger of the counts amounts to nothing more than a procedural assurance that the record reflects only one judgment of conviction while also preserving the factual findings for both counts. In this fashion, we can avoid the potential for problems caused by dismissing "charges" or "convictions." See, e.g., State v. Davis, 613 S.W.2d 218, 221 (Tenn. 1981).

In any event, the point to be made in the present case is that the fact that the trial court pretermitted a jury verdict regarding count two does not mean that, as a matter of law, we are to ignore the jury's finding of guilt. We note that Tennessee has a long-standing statute that provides that a general verdict of guilt may be applied to a valid count of an indictment, if the proof so allows, even though other counts are fatally defective. T.C.A. § 40-18-111. Although the trial court's instructions in the present case indicate that the jury's verdict was not to be a general one, the fact that, as a matter of law, the jury's finding of guilt fully supports conviction under count two, because it charges the same offense as intended to be charged in the fatally defective count one, should allow the verdict to apply to count two, as well. We believe that the jury verdict remains valid and that a judgment of conviction may be entered for first degree murder in this case under count two of the murder indictment.

## PUNISHMENT FOR GOING TO TRIAL

The defendant asserts that his constitutional rights were violated when the state offered a life sentence in return for a guilty plea, but sought the death penalty when the defendant chose to go to trial. The defendant relies on United States v. Jackson, 390 U.S. 570, 583, 88 S. Ct. 1209, 1217 (1968), which implies that the death penalty cannot be imposed in such "a manner that needlessly penalizes the assertion of a constitutional right." See also North Carolina v. Pearce, 395 U.S. 711, 89 S. Ct. 2072, 23 (1969).

In Jackson, the United States Supreme Court determined that a federal kidnapping statute, which provided for the imposition of the death penalty only upon a jury's verdict, unconstitutionally infringed upon the right to a jury trial. Essentially, as the Court noted, a person could be sure of avoiding a penalty of death under the statute only by entering a guilty plea, and thus avoiding a jury trial. 390 U.S. at 581, 88 S. Ct. at 1216. The defendant argues that the offer of a life sentence in return for a guilty plea in this case presents the same unconstitutional choice confronted by defendants under the statute at issue in Jackson.

The Court's holding in Jackson was based upon a statutory interpretation. Cf. Corbitt v. New Jersey, 439 U.S. 212, 99 S. Ct. 493 (1978). Its interpretation, however, does not apply to this case. Under the statute in Jackson, if the defendant pled guilty, he was completely shielded from execution. In Tennessee, however, the guilt phase and sentencing phase are separate trials. Accordingly, the state may seek the death penalty after a jury verdict or after a guilty plea. The Jackson Court suggested that there is nothing wrong with offering a life sentence in return for a guilty plea in those states where "the choice between life imprisonment and capital punishment is left to a jury in every case -- regardless of how the defendant's guilt has been determined." Jackson, 390 U.S. at 582, 88 S. Ct. at 1217 (emphasis in original).

> [A] prosecutor can decline to charge, offer a plea bargain, or
> decline to seek a death sentence in any particular case . . . .
> Of course, "the power to be lenient [also] is the power to
> discriminate," . . . but a capital punishment system that did not
> allow for discretionary acts of leniency "would be totally alien
> to our notions of criminal justice."

McCleskey v. Kemp, 481 U.S. 279, 312, 107 S. Ct. 1756, 1778 (1987) (citations omitted).

Tennessee courts have indicated a similar stance on this issue. See Bratton v. State, 477 S.W.2d 754, 757 (Tenn. Crim. App. 1971) ("a guilty plea is not

rendered involuntary by the fact that the accused is faced with an election between a possible death sentence on a plea of not guilty and a lesser sentence upon a guilty plea"); Parham v. State 885 S.W.2d 375, 381 (Tenn. Crim. App. 1994). We conclude that the defendant's constitutional rights were not violated by the state's offer of a plea bargain whose rejection left the defendant exposed to the death penalty.

## EXCLUSION OF JURORS[4]

The defendant maintains that two prospective jurors, Matthew Dupree and Melissa Adams, were impermissibly excused for cause because of their perceived views on capital punishment. The applicable standard for determining whether a juror was properly excused for cause because of his beliefs on the death penalty is delineated in Wainwright v. Witt, 469 U.S. 412, 424, 105 S. Ct. 844, 852 (1985), and is as follows: "whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" The United States Supreme Court also held that "this standard does not require that a juror's bias be proved with 'unmistakable clarity.'" Id. It further noted that "deference must be paid to the trial judge who sees and hears the jurors." Id. at 426, 105 S. Ct. at 853.

The state, the defense and the trial court all questioned these two prospective jurors. At various stages of the questioning, both individuals indicated that they could in no way vote for the death penalty.

---

[4] The state argues that because only four of the issues presented in the defendant's brief were raised in his motion for new trial, we are limited to consideration of those four issues in our review. Because of the qualitative difference between death penalty cases and other sentences, however, our supreme court has normally considered the merits of an issue even if the issue was not raised in the motion for new trial. See State v. Bigbee, 885 S.W.2d 797, 805 (Tenn. 1994); State v. Duncan, 698 S.W.2d 63, 67-68 (Tenn. 1985); State v. Strouth, 620 S.W.2d 467, 471 (Tenn. 1981). We have chosen to consider these issues on the merits, but with a significant caveat. The fact that various issues were not litigated in the trial court substantially limits the development of those issues in the record on appeal. With the burden being upon the defendant, as the appellant, to show reversible trial court error, an insufficient record in the trial court will be of no aid to his case.

21

When Mr. Dupree was asked by the court if he could consider the imposition of the death penalty if the statutory aggravating circumstances were proven beyond a reasonable doubt and there were no mitigators, Mr. Dupree stated, "No, I couldn't consider a death penalty." Though at times Mr. Dupree indicated that he would have to hear all the facts of the case before deciding about the death penalty, and that his general feelings concerning the death penalty would have no influence over his verdict of guilt or innocence, when asked by the trial court directly about the imposition of the death penalty, he stated he could not vote for it.

The trial court asked Mr. Dupree two times whether he could impose the death penalty. The first time he said that he did not "think so," and the second time he said "no." It can be inferred that his answer, that he could not vote for the death penalty, "would 'prevent or substantially impair [his] performance of his duties as a juror in accordance with his instructions and his oath.'" Wainwright, 469 U.S. at 424, 105 S. Ct. at 852; see also State v. Smith, 893 S.W.2d 908, 915-16 (Tenn. 1994). Although this determination might not be certain, it need not be. It can be said, however, that it is evident that Mr. Dupree's performance of his duties would have been impaired. Moreover, as the United States Supreme Court stated, great deference should be given to the trial court, who is "left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law." Wainwright, 469 U.S. at 426, 105 S. Ct. at 853.

Ms. Adams also expressed sincere reservations about the death penalty. She stated that she could follow the law but that she was opposed to the death penalty because of her religious beliefs. Her opposition to the death penalty was unequivocal. The defendant contends, however, that excusing Ms. Adams because of her religious beliefs interferes with the defendant's constitutional rights. Our supreme court has ruled that because a juror's "'views on capital punishment may have had a religious

foundation does not necessarily transform the test mandated by the United States Supreme Court in [Wainwright v. Witt] into religious tests for . . . [constitutional purposes].'" State v. Jones, 789 S.W.2d 545, 547 (Tenn. 1990) (quoting State v. Bobo, 727 S.W.2d 945, 949 (Tenn. 1987)). Accordingly, Ms. Adams' unmistakably clear opposition to the death penalty, though based on religion, could render her unfit as a juror.

We conclude the trial court appropriately excused jurors Matthew Dupree and Melissa Adams for cause because of their perceived views on capital punishment. This issue, therefore, is without merit.

## GUILT PHASE

### Sufficiency of the Evidence

The defendant argues that the evidence is insufficient to support the conviction of murder and robbery. Mainly, he contends that the state offered no proof, apart from the uncorroborated statement of the defendant, that a robbery in fact occurred.

In Tennessee, great weight is given to the result reached by the jury in a criminal trial. A jury verdict approved by the trial court accredits the state's witnesses and resolves all conflicts in favor of the state. State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). On appeal, the state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). In reviewing the sufficiency of the evidence, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. T.R.A.P. 13(e); Jackson v. Virginia,

23

443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); State v. Duncan, 698 S.W.2d 63, 67 (Tenn. 1985).

We hold that there is sufficient evidence to support the defendant's convictions. Darrell Hubbard, one of the residents of the apartment complex, testified that he heard several gunshots and saw a person wearing a long black coat running down the alley behind the apartment building. He further testified that he saw the victim lying on his back with his pockets turned inside out. Clifford Anderson, another resident, testified that he heard several gunshots and saw a man in a long black coat running down the alley. Mr. Anderson also testified that shortly after he saw the man running down the alley, he saw two to three individuals drive away in a blue Buick. This was the same type of car the defendant and his cohorts drove that night.

Kimberly Farmer testified that the defendant carried a gun and was wearing a long black coat the evening of the murder. Officer Palmer testified that she saw the victim's pockets turned inside out. Both officers on the scene also testified that the personal belongings of the victim, such as his wallet, were scattered on the ground. This evidence, taken in conjunction with the defendant's statement, is sufficient for a reasonable trier of fact to find the essential elements of the crimes beyond a reasonable doubt.

**Evidence of Victim's Family and Lifestyle**

The defendant contends that the prosecution's introduction of evidence at the guilt phase by the victim's nephew concerning the victim's employment history, age, health, living conditions, funeral, and the size and members of the victim's family, were not relevant to any aspect of the defendant's guilt, and was highly inflammatory. We note that the defendant did not object to the nephew's testimony. The defendant also asserts that references to these factors by the prosecutor in closing arguments were

24

equally prejudicial. The state argues that Payne v. Tennessee, 501 U.S. 808, 111 S. Ct. 2597 (1991) and Brimmer v. State, 876 S.W.2d 75 (Tenn. 1994), are dispositive of this issue. The defendant responds that Payne and Brimmer only hold that the introduction of such evidence is not per se inadmissible at the sentencing phase, not at the guilt phase.

"A State may legitimately conclude that evidence about the victim and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed." Payne, 501 U.S. at 827, 111 S. Ct. at 2609. Thus, contrary to the state's claim, Payne is not directly applicable to the guilt phase.

The defendant provides a list of cases from other states that indicates that evidence about the victim's family and personal life is irrelevant to the determination of guilt and highly inflammatory, and therefore inadmissible at the guilt phase of the trial. We agree that it was irrelevant at the guilt phase and should not have been admitted at that point. However, we question its harm given the other evidence in the case.

In State v. Bigbee, 885 S.W.2d 797 (Tenn. 1994), the defendant argued that testimony from two different witnesses concerning the victim's family and employment history had no bearing on the issues at the trial. The victim's daughter testified about the victim's family, and a store manager testified about the victim's job, wages, and employee status. Our supreme court stated that the testimony, though not relevant, "was brief and straightforward, and any error in its admission was harmless." Id. at 808. The court also mentioned that the defendant's failure to object to the testimony at trial prevented any determination of its relevancy. Id.

Similarly, in State v. Hensley, 656 S.W.2d 410 (Tenn. Crim. App. 1983), this court held that testimony from the victim's widow about the victim's personal characteristics and the consequences of his death on her was "irrelevant and obviously designed to raise sympathy for the deceased victim and his family." Id. at 414. Because the testimony was brief and straightforward, the evidence against the defendant was overwhelming, and the jury imposed a lesser penalty, the court decided that the testimony more probably than not did not affect the jury's verdict. Id. The court cautioned, however, "against the use of such testimony in the future." Id.

The testimony at issue in the present case was offered by the victim's nephew and includes information about the victim's age, health, employment history, relatives, family size, telephone conversations, and his funeral. As with the testimony in Bigbee and Hensley, the nephew's testimony was relatively brief and straightforward. Moreover, the evidence of guilt in the present case was overwhelming, which evidence included the defendant's own confession to the police. When viewed in light of the other evidence against the defendant, the admission of this testimony was harmless error.

We note, as well, that the defense did not object to the nephew's testimony about the victim's background. Ordinarily, this results in no record development about the potential relevance of such evidence and constitutes a waiver. However, we caution the state that the social and family background of a victim is normally so irrelevant to the issue of a defendant's guilt and the law is so well settled regarding such evidence being inadmissible that its continued use may constitute plain error involving prejudice to the integrity of the judicial process in Tennessee.

26

## Use of Opinion Evidence

## (A)

The defendant claims that Dr. Smith's testimony about the distance from which the gun was fired, the manners in which revolvers leave powder burns, and the bullet track in the victim's leg, was outside the scope of his expertise. Dr. Smith was qualified as an expert in the field of anatomical, clinical, and forensic pathology, with an extensive educational and practical background. He testified that as part of his training in forensic pathology, he has examined the various patterns that are caused by powder burns.

> It is a well-established rule of law that the allowance of expert testimony, the qualifications of the expert witness, the relevancy and competency of expert testimony, the trustworthiness of the facts and data forming the basis of the expert witness's opinion, and whether the facts and data are the type reasonably used by experts in the same field in forming opinions are within the sound discretion of the trial court.[5] This Court will not interfere with the exercise of this discretion unless clear abuse in exercising this discretion appears on the face of the record.

State v. Henry Eugene Hodges, No. 01C01-9212-CR-00382, Davidson County, slip op. at 35 (Tenn. Crim. App. May 18, 1995) (citations omitted) (footnote added).

Dr. Smith's testimony concerning the distance of the victim from the shooter and the pattern of the powder burns are well within the field of his expertise. See State v. Wright, 756 S.W.2d 669, 673 (Tenn. 1988) (Court stated that medical examiner's testimony about distance from which gun was fired was "obviously within the range of his expertise."); State v. Van Tran, 864 S.W.2d 465, 470 (Tenn. 1993)

---

[5] We note that Tennessee no longer requires that scientific evidence be shown to have "'gained general acceptance in the particular field in which it belongs.'" Kenneth McDaniel v. CSX Transportation, Inc., No. 01-S-01-9605-CV-00095, slip op. at 10 (Tenn. Sept. 29, 1997) (for publication) (quoting Frye v. United States, 293 F. 1013 (D.C. Cir. 1923)). However, the evidentiary rules continue to require "a determination as to the scientific validity or reliability of the evidence." Id. at 16. In determining the evidence's reliability, the trial court may now also consider, in addition to the Frye test, (1) whether the scientific evidence has been tested and the methodology with which it has been tested, (2) whether the evidence has been subjected to peer review or publication, (3) whether a potential rate of error is known, and (4) whether the expert's research in the field has been conducted independent of litigation. Id. at 16-17.

(uncontroverted testimony of Dr. Smith, the medical examiner in the present case, describing distance of victim from shooter).

The state contends that Dr. Smith's testimony that the bullet track through the victim's leg was consistent with the theory that the victim was running was proper. The state suggests that the witness was not testifying that the victim was in fact running when he was shot, but rather that the bullet track through the leg was compatible with a person who had been running. The defendant argues, however, that the witness possessed no expert training in this area which would substantially assist the jury on this matter. The state asserts the defendant has proffered no authority stating that the study of gunshot wound tracks is outside the field of forensic pathology.

Dr. Smith's testimony about the wound track in the victim's leg is within the scope of his expertise. Dr. Smith testified that the wound track indicates the angle through which the bullet passed through the body. He stated this particular track could be consistent with the victim's leg being in a position where the upper leg was raised, i.e., as in a running position. He further testified, though, that this "would have to be correlated with the circumstances as were known at the time of the incident." And on cross-examination, Dr. Smith testified that the wound track caused by the bullet was also consistent with the theory that the victim was on a higher plane than the shooter. Because the testimony is based on information Dr. Smith obtained from his area of expertise and such expertise could substantially assist the jury in understanding the evidence, the testimony of Dr. Smith was appropriate. See State v. Caughron, 855 S.W.2d 526, 537 (Tenn. 1993), Tenn. R. Evid. 702. Moreover, because the testimony did not establish a definite theory of the wound tract, the defendant was able to elicit testimony from Dr. Smith that his theory of the shooting was feasible.

**(B)**

The defendant argues that the testimony of Officer Dana Stine that "it kind of appeared like [the victim] had to clean out his pockets or something like that," was an improper opinion which inappropriately suggested to the jury that the victim had been robbed. See Tenn. R. Evid. 701(a). Particularly, the defendant contends that the witness could "readily and with equal accuracy and adequacy communicate what [he] perceived [about the crime scene] to the trier of fact without testifying in terms of opinions or inferences." Tenn. R. Evid. 701(a)(2). The defendant also argues that given that a defendant's statement must be corroborated by extrinsic evidence to support a conviction, allowing Officer Stine's improper testimony prevents the state from demonstrating that the testimony did not contribute to the jury's finding that the defendant robbed the victim. The state contends that the testimony was permissible, but even if it were error, it would be harmless error.

Our supreme court has addressed a similar issue. In State v. Middlebrooks, 840 S.W.2d 317 (Tenn. 1992), the officer testified that a bloody T-shirt found around the victim's neck had been used as a gag. The defense objected to this testimony as inadmissible lay opinion, but the trial court allowed it anyway. The supreme court held that the testimony was an inadmissible lay opinion and stated:

> A non-expert must ordinarily confine his testimony to a narration of facts based on first-hand knowledge and avoid stating mere personal opinions. Blackburn v. Murphy, 737 S.W.2d 529, 531 (Tenn. 1987). The purpose of this rule is "to preserve the primary fact-finding role of the jury, since '[i]t is the function of the witness to state evidentiary facts and the function of the jury to draw such conclusions as the facts warrant.'" Id. (quoting Wilson v. Nashville, Chattanooga & St. Louis Ry., 16 Tenn. App. 695, 705, 65 S.W.2d 637, 643 (1933)).
>
> Nevertheless, there are exceptions to the general rule. "Non-expert opinion testimony can be admissible when 'such testimony describes observed facts in the only way in which they can be clearly described.'" Id., 737 S.W.2d at 532 (quoting National Life & Accident Ins. Co. v. Follett, 168 Tenn. 647, 662, 80 S.W.2d 92, 98 (1935)).

Id. at 330-31.  Although the court stated that the question of admissibility of the testimony was close, it concluded that it would be harmless error even if it were inadmissible.  The court explained that because the defendant had admitted to gagging the victim, the officer's testimony was harmless.

We view the opinion testimony in the present case to be improper, but as in Middlebrooks, its admission is harmless error.  There is sufficient evidence elsewhere in the record that corroborates the defendant's statement that he robbed the victim.  Darrell Hubbard, one of the residents of the apartment complex, testified that he saw the victim lying on his back with his pockets turned inside out.  Officer Palmer testified that she saw the victim's pockets turned inside out.  Both officers testified that the personal belongings of the victim, such as his wallet, were scattered on the ground.  In fact, under this evidence and the defendant's statement, Officer Stine's opinion borders on stating the obvious.  Accordingly, his opinion testimony was harmless error.

**Chain of Custody of Tangible Evidence**

The defendant contends that a juvenile court badge found at the scene was improperly introduced into evidence.  The defendant argues that the state failed to establish a proper chain of custody with respect to the badge.  In his testimony, Officer Stine stated that he placed all of the victim's personal items into one envelope for inventory purposes.  At the trial, however, it was revealed that the badge had been removed and placed into another envelope by another member of the police department.  The defendant contends that because the state could not establish who removed the badge, that its introduction was inappropriate.  The state argues its introduction was proper given that the badge was a particular object that Officer Stine identified as an item he recovered from the scene.

The case upon which the defendant relies tends to discount his argument. In State v. Goodman, 643 S.W.2d 375, 381 (Tenn. Crim. App. 1982), this court held: "As a condition precedent to the introduction of tangible evidence, a witness must be able to identify the evidence or establish an unbroken chain of custody." (Emphasis added). "In determining the admissibility of tangible evidence, the law does not require absolute certainty of identification. It is sufficient if the facts establish a reasonable assurance of identity of the evidence." State v. Larry G. Hart, No. 02C01-9406-CC-00111, Hardin County, slip op. at 6-7 (Tenn. Crim. App. June 28, 1995). See also State v. Phillip Branson, 03C01-9305-CR-00148, Roane County, slip op. at 13 (Tenn. Crim. App. Dec. 9, 1994). After reviewing the record, we conclude that the introduction of the badge was proper.

## INSTRUCTIONS

### Witness Credibility

The defendant contends that the trial court's instruction on the assessment of witness credibility went beyond the bare "presumption of truthfulness" and general methods for assessing credibility upheld in Cupp v. Naughten, 414 U.S. 141, 94 S. Ct. 396 (1973). The trial court instructed the jury in this case as follows:

> You will take all of the evidence adduced in the case by the State and the defendant and give it a full, fair and impartial consideration. If there are any conflicts in the statements of the different witnesses, it is your duty to reconcile them, if you can, for the law presumes that every witness has sworn to the truth; but, if you cannot, the law makes you the sole and exclusive judges of the credibility of the witnesses and the weight to be given their testimony. In forming your opinion as to the credibility of a witness, you may look to the proof, if any, of his general character, the manner and demeanor of the witness, the consistency or inconsistency of his statements, their probability or improbability, his ability and willingness to speak the truth, his intelligence and means of knowledge, his motive to speak the truth or swear to a falsehood, his interest or lack of interest in the outcome of the trial.

The defendant argues that the instruction is a comment on the evidence and improperly provides limited rules for the jury to determine credibility issues of fact.

31

We believe that the instruction is within the confines of <u>Naughten</u>. The instruction in <u>Naughten</u>, like the instruction in this case, informed the jury "to consider the manner of the witness, the nature of the testimony, and any other matter relating to the witness' possible motivation to speak falsely. [The jury] thus remained free to exercise its collective judgment to reject what it did not find trustworthy or plausible." 414 U.S. at 419, 94 S. Ct. at 401. Moreover, as emphasized in the above instruction, the trial court instructed the jury that it <u>may</u> consider the enumerated guidelines. We believe that the instruction adequately guides the jurors in their consideration of witness credibility while leaving them free of undue constraints on their evaluations. As such, the instruction does not amount to a comment on the evidence, but is an aid to the jurors if they find irreconcilable conflicts in the testimony.

## "Intentional"

The defendant contends that the trial court's definition of intentional, when instructing the jury that they must find that the defendant intended to commit the especially aggravated robbery, was improper. Specifically, the defendant claims that the trial court's instruction defined "general intent," and the crime of aggravated robbery is a specific intent crime requiring a finding of "specific intent." The defendant offers no authority in support of his claim. The trial court instructed the jury that "a person acts 'intentionally' when that person acts with a conscious objective either: (1) to cause a particular result; or (2) to engage in particular conduct." As the state asserts, this definition is in conformity with the statute. <u>See</u> T.C.A. § 39-11-302(a) (1991). Accordingly, we can find no error in the trial court's instruction.

## Reasonable Doubt

The defendant argues that the instructions on reasonable doubt did not lend content to the words "moral certainty" used by the trial court. The trial court instructed the jury in the guilt phase of the trial as follows:

> Reasonable doubt is that doubt engendered by an investigation of all the proof in the case and an inability, after such investigation, to let the mind rest easily upon the certainty of guilt. Reasonable doubt does not mean a doubt that may arise from possibility. Absolute certainty of guilt is not demanded by the law to convict of any criminal charge, but moral certainty is required and this certainty is required as to every proposition of proof requisite to constitute the offense.

The trial court gave the following instruction during the penalty phase:

> Reasonable doubt is that doubt engendered by an investigation of all the proof in the case and an inability, after such investigation, to let the mind rest easily upon the certainty of your verdict. Reasonable doubt does not mean a doubt that may arise from possibility. Absolute certainty of guilt is not demanded by the law to convict of any criminal charge, but moral certainty is required and this certainty is required as to every proposition of proof requisite to constitute the verdict.

The defendant contends that the phrases "inability, after such investigation, to let the mind rest easily upon the certainty of guilt" and "arise from possibility," when used to explain moral certainty, violate due process and allow the jury to convict upon a standard lower than that set forth in Victor v. Nebraska, 511 U.S. 1, 114 S. Ct. 1239 (1994). In Victor, the United States Supreme Court ruled that the phrase "moral certainty" may have lost its historical meaning and that modern juries, unaware of the historical meaning, might understand "moral certainty," in the abstract, to mean something less than the high level of determination constitutionally required in criminal cases. Id. at 13-14, 114 S. Ct. at 1246-47. Although the Court stated that it did not condone the use of the "moral certainty" phrase, the Court held that the phrase could pass constitutional muster if used in conjunction with a modifying instruction that lent meaning to the phrase. Id. at 15, 114 S. Ct. at 1248. In order to meet the requirements of due process, the jury instructions must be examined as a whole, without considering particular phrases out of context. Id. at 5, 114 S. Ct. at 1243

The Supreme Court has held that "grave uncertainty" and "actual substantial doubt," when modifying moral certainty, did not meaningfully convey the definition of reasonable doubt and thus violated the due process clause. Cage v.

33

Louisiana, 498 U.S. 39, 41, 111 S. Ct. 328, 329 (1990).  Neither of these phrases, though, were used in the instructions in the present case.  In Victor, the Court, though satisfied with the modifying "abiding conviction" language used by the trial court, held that the constitution does not require the use of any specific terminology in defining reasonable doubt.  Id. at 14-15, 114 S. Ct. at 1243, 1247.  It did suggest, however, that the phrase "moral certainty" by itself would be insufficient to convey the appropriate meaning of reasonable doubt.  Id. at 15, 114 S. Ct. at 1247.

The primary question, therefore, is whether the phrase "moral certainty," when used in conjunction with "let the mind rest easily" and "arise from possibility," correctly conveyed to the jury the concept of reasonable doubt.  Though neither of these phrases have been before the United States Supreme Court, our courts have consistently upheld the constitutionality of similar instructions which included the phrases "let the mind rest easily" and "arise from possibility."  State v. Nichols, 877 S.W.2d 722, 734 (Tenn. 1994); Pettyjohn v. State, 885 S.W.2d 364, 365-66 (Tenn. Crim. App. 1994).  Accordingly, we conclude that the jury instructions on reasonable doubt in the present case did not violate the defendant's rights under the United States or Tennessee Constitution.

## SENTENCING PHASE

### Use of Prior Convictions as Aggravating Circumstance

The defendant contends that using his prior convictions for later-occurring offenses as an aggravating circumstance violates the defendant's constitutional rights.  The state argues that the use of this aggravator is prescribed by law.  Under T.C.A. § 39-13-204(i)(2), a prior conviction of a felony, "other than the present charge, whose statutory elements involve the use of violence to the person" can be used as an aggravating circumstance for the imposition of the death penalty.

The Tennessee Supreme Court has held that the chronological order of the commission of the offenses is not relevant for sentencing purposes. Whether the conviction was entered before the sentencing phase at which it is introduced is the determining factor when using a prior conviction under the statute. Bigbee, 885 S.W.2d at 817; Nichols, 877 S.W.2d at 736. Thus, even though the prior conviction for the aggravated robbery is based upon an offense committed by the defendant after the offenses in the present case, the convictions were returned before the sentencing phase in the present case. It is the fact of the prior convictions for a violent offense that remains relevant to capital sentencing, not its timing.[6]

**Underlying Facts of Previous Convictions**

The defendant contends that the introduction of evidence concerning the specific facts of the prior convictions used as an aggravating circumstance was improper. During the sentencing phase of the trial and over the defendant's objection, the state called Gary Yochum, one of the victims of the later robberies, to testify about the facts of that event. Before Mr. Yochum testified, however, the keeper of the records for the Shelby County Clerk's Office testified on behalf of the state that two convictions for aggravated robbery had been returned against the defendant relative to the Yochums.

The defendant argues that the testimony of the clerk was sufficient to establish the prior violent conviction, and that the testimony of Mr. Yochum was cumulative and served no purpose other than to inflame the passions and the

---

[6] The defendant argues that it is a constitutional violation to permit enhancement by later-occurring events in capital sentencing, while precluding it in non-capital sentencing range enhancement under T.C.A. § 40-35-106(b)(1). That provision states that a "'prior conviction' means a conviction for an offense occurring prior to the commission of the offense for which the defendant is being sentenced." The statute for capital sentencing, however, does not define "prior conviction." See T.C.A. § 39-13-204(i)(2). Our supreme court has interpreted the statute to mean the prior conviction could be of an later-occurring offense. The court has also stated that, absent "exceptionally clear proof," the defendant's claim that this interpretation would always allow the prosecutor to select the order of prosecution, thereby insuring that an aggravating circumstance of a prior violent conviction would be available for a murder trial, is untenable. See Nichols, 877 S.W.2d at 736. We see no such "exceptionally clear proof" in the record before us.

prejudices of the jury. The state, however, asserts that the defendant introduced a theory that the shooting in the present case was accidental and that the testimony of Mr. Yochum was necessary for rebuttal purposes.

In State v. Bigbee, 885 S.W.2d 797 (Tenn. 1994), our supreme court held:

> Evidence of facts regarding a previous conviction to show that it in fact involved violence or the threat of violence to the person is admissible at a sentencing hearing in order to establish the aggravating circumstance. State v. Bates, 804 S.W.2d 868, 879 (Tenn. 1983); State v. Moore, 614 S.W.2d 348, 351 (Tenn. 1981). However, it is not appropriate to admit evidence regarding specific facts of the crime resulting in the previous conviction, when the conviction on its face shows that it involved violence or the threat of violence to the person. Id.

Id. at 811;[7] see T.C.A. § 39-13-204(i)(2). In Bigbee, the state solicited testimony from a police detective about the facts surrounding a prior murder and the character of the victim. Also, the state's closing argument referred to the detective's testimony concerning the prior crime and to the sentence imposed for that conviction. The court ruled that the detective's testimony and the state's arguments were inadmissible and improper. 885 S.W.2d at 812.

The defendant contends that the facts in the present case are essentially indistinguishable from those in Bigbee. Because testimony establishing the identity of the prior violent offenses and the existence of the convictions was already introduced, the defendant argues, any additional evidence about the underlying facts was merely cumulative and prejudicial. The defendant asserts that the convictions for the offenses

---

[7] The prior convictions in State v. Moore, 614 S.W.2d 348 (Tenn. 1981), burglary in the second degree and arson, were crimes to property, and thus did not facially indicate violence or threat of violence to the person. The court stated that in such a situation, it would be appropriate to introduce evidence establishing violence or threat of violence to the person. Id. at 351. The court also noted, however, that evidence would not be needed when the prior convictions were for crimes "which by their very definition involves the use or threat of violence to a person." Id.

of aggravated robbery establish the aggravating circumstance of a prior violent conviction.[8]

The state, however, argues that <u>Bigbee</u> is distinguishable in two aspects. First, the sentences for the prior convictions were not mentioned by the state in the present case. The state implies that the ruling in <u>Bigbee</u> would have been different had the state not mentioned the prior sentences. As the supreme court stated in <u>Bigbee</u>, however, the error was merely "compounded" by the reference to the previous sentences. <u>Id</u>. at 811.

Second, the state submits that unlike the evidence in <u>Bigbee</u>, the testimony of Mr. Yochum was required to rebut the defendant's theory that the shootings were accidental. The primary question for this court, therefore, is whether the testimony of Mr. Yochum was proper rebuttal evidence. <u>See</u> <u>Cozzolino v. State</u>, 584 S.W.2d 765, 767-68 (Tenn. 1979).

Referring to the present crime, the defendant stated to the police that the gun just "went off." It is the state's position that this represented the defendant's theory that the shooting in the present case was accidental, and, thus, in order to rebut this theory, the specific facts of the Yochum robbery needed to be introduced. The defendant robbed Mr. and Mrs. Yochum at gunpoint. A shot was fired during that robbery, but no one was injured. During the cross-examination of the defendant in the sentencing phase of the present case, the defendant testified that he was not shooting at the Yochum's, but that the gun just "went off."

---

[8] We note that the jury was instructed in the guilt phase that aggravated robbery required both the use of violence or putting the victim in fear and the use of a deadly weapon (or reasonable facsimile) or the victim's receipt of serious bodily injury.

The defendant asserts that his statement to the police suggested that only the first shot was accidental and that the other four shots were fired intentionally. He argues that he was not suggesting that all the shots were fired accidentally. If the state was indeed trying to rebut the defendant's statement, the defendant responds that the state was rebutting its own proof because the state introduced the defendant's statement into evidence. Furthermore, the defendant's testimony concerning the gunshot in the Yochum robbery was solicited during cross-examination by the state. Finally, the defendant contends that if the state was sincerely interested in rebutting a theory of an accidental shooting, it would have introduced testimony to that effect during the guilt phase of the trial, rather than at the sentencing phase.

The testimony of Mr. Yochum and the state's reference to it in argument for the purpose of establishing the prior conviction are improper and prejudicial under the Bigbee ruling. We must now decide if this evidence and argument is appropriate under the state's rebuttal contention. The state admits that the jury apparently rejected the theory that the shooting was accidental when it returned its verdict in the guilt phase. The state argues, however, that the evidence of the prior conviction tended to rebut the mitigator presented in the sentencing phase, i.e., that the shooting was accidental. As the defendant points out, though, the only witness who testified for the defendant during the sentencing phase was the defendant himself. Moreover, the defendant asserts that his theory was that the shootings were intentional, but that the killing was accidental. This is to be an accurate assessment of the theory presented to the jury. The state's introduction of the evidence for the purpose of rebutting the defendant's claim that the shootings were accidental does not, in fact, rebut the defendant's evidence because the defendant conceded that the shootings in the present case were intentional.

The state argues that if the introduction and argument of such evidence is error, it is no more than harmless error. The state suggests that Mr. Yochum's testimony was rather straightforward and not so inflammatory, and simply reiterated the testimony of the keeper of the records of the Shelby County Clerk's Office. We do not agree. The testimony of Mr. Yochum described the specific details of the prior crimes. In its argument to the jury, the state relied heavily upon those details, including the former victim's continued fear, in order to increase the seriousness of the prior convictions as an aggravating circumstance. With that aggravating circumstance being the only one that the jury found to exist, we believe that the evidence of the details of the prior crimes more probably than not affected the jury's verdict. Thus, under existing law, reversible error occurred.

## Exclusion of Mitigating Evidence

The defendant contends that the trial court should have allowed Mr. Carl Nelson to testify at the sentencing phase of the trial as an expert witness concerning the defendant's remorsefulness. He also contends that even if the court did not allow Mr. Nelson to testify as an expert, it should have permitted him to testify as a lay witness. The state counters that the defendant failed to qualify Mr. Nelson as an expert in the field of psychology. It also asserts that the court afforded Mr. Nelson ample opportunity to testify as a lay witness, but that Mr. Nelson, by his absence, deprived the defendant of the benefit of his testimony.

The defendant proffered Mr. Nelson as an expert in psychology. At the time of the trial, Mr. Nelson was employed by the state as a Psychological Chaplain II. He has a bachelor's degree in social psychology and a master's degree in pastoral counseling. Mr. Nelson testified that he had performed thousands of psychological evaluations on inmates in Tennessee over the previous eight years using a test he had developed himself. The trial court, however, was not satisfied with Mr. Nelson's

39

qualifications as an expert in the field of psychology relative to his testing procedures. The trial court ultimately ruled that Mr. Nelson could testify as a pastoral counselor about his observations from the interviews and counseling he had with the defendant, but that he could not give an expert opinion about the defendant's remorsefulness.

Mr. Nelson, however, never testified before the jury. The defendant asserts that the trial court refused to allow any of Mr. Nelson's testimony, even the testimony the court was ultimately willing to permit regarding his observations, and excused him from the courtroom. The record reflects that during the questioning of Mr. Nelson, he and the trial court engaged in some heated exchanges regarding Mr. Nelson's explanatory answers to some questions and his method of answering. After several more exchanges between the trial court and the witness, the trial court excused Mr. Nelson from the courtroom and ruled that he would not allow him to testify. Immediately after Mr. Nelson left the courtroom, the trial court continued the trial until the following day. On the following day, the trial court informed the defense that Mr. Nelson could testify about his interviews and counseling with the defendant. It granted the defendant several recesses that morning for the purpose of contacting Mr. Nelson, but the defendant was unsuccessful. Consequently, Mr. Nelson never testified.

First, we believe that under the evidence presented, the trial court was within its discretion to hold that Mr. Nelson did not qualify to render an opinion as an expert witness. Although the defendant presented evidence that could support an inference that Mr. Nelson had substantial experience and training relative to counseling and evaluating prison inmates, the trial court questioned the basis of his evaluation techniques and the scientific nature of his conclusions. There is material evidence in the record to support the trial court's doubts. Ultimately, the trial court concluded that Mr. Nelson did not possess the expertise for rendering an expert opinion as to the defendant's remorsefulness. See Tenn. R. Evid. 702. The allowance of expert

40

testimony is within the discretion of the trial court. See State v. Ballard, 855 S.W.2d 557, 562 (Tenn. 1993).

However, the real concern in this case is the manner in which the trial court's actions were a cause of the defendant's losing a potentially material witness for the sentencing phase. Contrary to the state's implied assertion, the record before us does not cast fault upon the defendant for the failure of Mr. Nelson to appear as a witness. By refusing to allow Mr. Nelson to testify, the trial court effectively excused him from any obligation or expectation to appear and testify thereafter. He had no duty to remain available. Also, nothing in the record reflects that, after the trial court relented the next morning, the defense made anything but a good faith effort to reobtain Mr. Nelson as a witness.

In this capital case, the defendant was entitled to present evidence relevant to punishment concerning his character, background history, or physical condition, and any other evidence tending to establish any mitigating factors. See T.C.A. § 39-13-204(c). Our supreme court has acknowledged the importance of this statutory provision. See, e.g., State v. Odom, 928 S.W.2d 18, 27-28 (Tenn. 1996) (defendant's details of history given to psychologist during interview admissible despite hearsay quality). In fact, it is the defendant's constitutional right to present such matters.

> [T]he Eighth and Fourteenth Amendments require that the sentencer, and all but the rarest kind of capital case, not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.

Lockett v. Ohio, 438 U.S. 586, 604, 98 S. Ct. 2954, 2964-65 (1978); see also McKoy v. North Carolina, 494 U.S. 433, 442-43, 110 S. Ct. 1227, 1233 (1990); Penry v. Lynaugh, 492 U.S. 302, 317-18, 109 S. Ct. 2934, 2946-47 (1989).

In this case, the trial court acknowledged the competency of Mr. Nelson to testify about his counseling with and observations of the defendant. Although relatively limited, Mr. Nelson's jury-out testimony indicated that he had interviewed the defendant, obtaining background information regarding him, and had observed the defendant in his prison environment. This was the only witness proffered by the defendant, other than himself, to present to the jury a picture of the defendant's character and background history, including the time during his imprisonment. We also note that Mr. Nelson indicated that the defendant did not easily disclose his real feelings.

In the context of the state assailing the sincerity of the defendant's statement of regret, through his demeanor, and the limited nature of the information provided by the defendant's testimony, we believe that Mr. Nelson's testimony would have been material to the defendant's cause in the sentencing phase. Certainly, the record reflects that he was better able to articulate the defendant's background history to the jury than was the defendant.

In Skipper v. South Carolina, 476 U.S. 1, 8, 106 S. Ct. 1669, 1673 (1986), the Supreme Court held that error in excluding evidence is not harmless if the exclusion of the evidence "may have affected the jury's decision to impose the death sentence." Given the singular nature of the evidence presented by the state for its one proven aggravating circumstance and the otherwise limited evidence presented by the defendant in mitigation, we believe that the loss of Mr. Nelson as a witness may have had such an effect. The refusal to allow Mr. Nelson to testify under the circumstances in this case constitutes reversible trial error.

42

## IMPROPER ARGUMENT

### Caldwell Violation

The defendant claims that the prosecutor's closing argument in the sentencing phase of the trial violated the constitutional principles set forth in Caldwell v. Mississippi, 472 U.S. 320, 105 S. Ct. 2633 (1985). In closing argument, the prosecutor made the following statements:

> There's not one thing to mitigate except the old defense lawyer guilt trip of you're to give him the electric chair. You're not to give anybody anything. You don't give him the death penalty. You don't do that. You do your duty. You can't give someone the death penalty. If he gets it, he ordered it up himself. So don't let the defense put a guilt trip on you. You're here to do a duty.

In Caldwell, the United States Supreme Court held that "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." Id. at 328-29, 105 S. Ct. at 2639. The argument made by the prosecutor in the Caldwell case contained phrases such as "your decision is not the final decision," "your job is reviewable," and "the decision you render is automatically reviewable by the Supreme Court." Id. at 325-26, 105 S. Ct. at 2637-38. Although the defense objected to these statements, the trial judge overruled the objection and instructed the prosecutor to inform the jury that their decision was automatically reviewable. The Supreme Court ruled that the argument was improper and in violation of the constitution. In the later case of Romano v. Oklahoma, 512 U.S. 1, 9, 114 S. Ct. 2004, 2010 (1994), the United States Supreme Court noted that it has

> since read Caldwell as "relevant only to certain types of comment - those that mislead the jury as to its role in the sentencing process in a way that allows the jury to feel less responsible than it should for the sentencing decision." Darden v. Wainwright, 477 U.S. 168, 184, n.15, 106 S.Ct. 2464, 2473, n.15 (1986). Thus, "[t]o establish a Caldwell violation, a defendant necessarily must show that the remarks to the jury improperly described the role assigned to the jury by

local law." Dugger v. Adams, 489 U.S. 401, 407, 109 S. Ct. 1211, 1215 (1989).

We believe that the statements made by the prosecutor in this case could arguably be read as an attempt to diminish in the eyes of the jury its responsibility in imposing the death penalty. Statements such as "keep in mind, you don't impose the sentence, the law provides the sentence," State v. West, 767 S.W.2d 387, 399 (Tenn. 1989), and "she is responsible for her death, no one else," and "it is she, the defendant, that has signed her own death warrant," Buttrum v. Black, 721 F. Supp. 1268, 1316 n.11 (N.D. Ga. 1989), aff'd, 908 F.2d 695 (11th Cir. 1990), have been construed as minimizing in the jury's eyes its role in imposing the death penalty.

The ultimate question, though, is whether the argument had an intolerable risk of affecting the sentencing decision. See State v. Irick, 762 S.W.2d 121, 131 (Tenn. 1988). Factors that we can consider in making this review include the following: whether the trial court endorsed the improper remarks; the extent and the specificity of the statements given the context of the argument as a whole; whether other portions of the prosecutor's argument properly set forth the jury's role; and whether the court properly instructed the jury as to its role under the law. See West, 767 S.W.2d at 399.

We note that the defense in this case did not object to the prosecutor's argument. Also, the trial court did not endorse the improper remarks, and it properly instructed the jury about its role according to the law. Moreover, the prosecutor did not refer the jury to another authority as having the final say in the death sentence. Although the prosecutor did not subsequently set forth the jury's role, he did impress upon the jury later to "do [its] duty." Under these circumstances, we do not believe that the prosecutor's argument presented an intolerable risk that the jury's sentencing decision was unreliable.

44

## Prosecutorial Misconduct

The defendant contends that several arguments made by the prosecutor during the sentencing phase were improper so that his sentence should be reversed. The state asserts that its arguments to the jury were proper and that even if one or two of the statements should have been avoided, the argument, when viewed as a whole, was appropriate.

When claiming prosecutorial misconduct in argument, the defendant is required to show that the argument was so inflammatory or the conduct so improper that it affected the verdict to his detriment. Harrington v. State, 385 S.W.2d 758, 759 (Tenn. 1965). In review, this Court should consider several factors, including the intent of the prosecutor, the curative measures which were undertaken by the court, the improper conduct viewed in context and in light of the facts and circumstances of the case, the cumulative effect of the remarks with any other errors in the record, and the relative strength or weakness of the case. Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976). The trial court has wide discretion in controlling the argument of counsel. State v. Smith, 527 S.W.2d 737, 739 (Tenn. 1975).

The statements of concern to the defendant in this appeal are as follows:

> Ladies and gentleman, this old city here is violent, and this man is violent. And we who pass the age of fifty, we can see ourselves. We are victims. We are prey. Never thought I'd be looking at myself like that back when I was playing football. I thought I was a pretty tough guy. But, hey, I'm fifty now, and, hey, my gait is going to halt and things like that, and I'm going to be like Mr. Harris one of these days. Pause for thought.

> Mr. Harris' life was not a joke. It was not flippant. He took care of his mother, 1988, moves off. He's sixty-four years, in an apartment, working, minding his own business, might have been an okay guy. Two nephews from Atlanta, Georgia, come down here. They cared enough about him . . . We're not asking much of Mr. Johnny Harris. All he wanted in life was to go to Mega Market, work, go home. He didn't want to live in Graceland or anything like that. He wasn't asking for a big house in Germantown. He's got a little old

two-bedroom apartment off Union. That's all. His life was serious. It was simple, but it was serious. And he's got a right to live that life.

Ladies and gentlemen, the State's proven it to you. You're at the point where the state has proven to you aggravating circumstances. The State needs one. We've got two. And ladies and gentlemen, those two outweigh the mitigating because there isn't any. The only verdict, ladies and gentlemen, that you can return in this case, the verdict that truth dictates and justice demands, in fact justice screams for, is death.

As an initial concern to our review, we note that the defendant did not object to this argument. Needless to say, neither the trial court nor the state was made aware of any need to stop the argument, alter the argument or give curative instructions. Under these circumstances, it would only be error so plain and material to the cause that the trial court should have corrected it without prompting that would warrant our granting relief.

A portion of this argument addresses the personal characteristics and lifestyle of the victim, as well as referring to the victim's family members. As previously noted, victim impact argument has been held to be constitutionally proper in an appropriate case. Payne v. Tennessee, 501 U.S. at 827, 111 S. Ct. at 2609. However, this does not mean that such argument is otherwise relevant and admissible under Tennessee law. That is, the only evidence that is relevant during the sentencing phase of Tennessee's capital sentencing scheme is that tending to establish or disprove the existence of aggravating circumstances or mitigating factors. See Cozzolino v. State, 584 S.W.2d 765, 768 (Tenn. 1979). Any evidence that does not go to the proof of one or the other of these issues is irrelevant to the jury's deliberation. Id. Recently, this court has concluded that victim impact evidence is irrelevant in the context of our capital sentencing scheme. See State v. Clarence C. Nesbit, No. 02C01-9510-CR-00293, Shelby County, slip op. at 31-33 (Tenn. Crim. App. Apr. 22, 1997).

46

However, we cannot say that the argument constituted plain error or resulted in real prejudice. In the context of the total argument by the prosecutors, the part involving victim impact was insignificant. Therefore, we believe no plain error exists.

As to the portion of the argument that the defendant suggests improperly comments on the absence of any mitigating factors, our supreme court has held that such statements by the prosecutor do little more than "set out the State's interpretation of the proof." State v. Brimmer, 876 S.W.2d 75, 85 (Tenn. 1994). The defendant's contention in this respect, therefore, is without merit.

The defendant also argues that the argument by the prosecutor tending to illustrate a bleak picture of "growing old in the city" served no other purpose than placing fear in the minds of the jury. We note that this court has held that argument that the jury is the voice of the community is not misconduct. See State v. Johnnie Lamont Dalton, No. 01C01-9408-CR-00291, Davidson County, slip op. at 5-6 (Tenn. Crim. App. July 11, 1995). Obviously, though, argument that inflames the passions and fears of the jurors, tending to influence a sentencing decision with irrelevant considerations, can be cause for reversal. See Bigbee, 885 S.W. 2d at 809. However, in considering the argument in this case, made without objection, in the context of the state's total argument, we do not believe that it constitutes plain error that affected the verdict.

The defendant also claims references by the state to the defendant's statements that he threatened to kill his codefendants were blatantly improper. Immediately after the statements were made, however, the defendant successfully objected, and the court admonished the prosecutor from making such comments.

47

Moreover, as the state suggests, the testimony of Kimberly Farmer did in fact state that the defendant had made similar comments in her presence.

The defendant also contends that comments in the state's closing argument during the sentencing phase concerning the victims of the defendant's prior crime were improper. We have already concluded this type of argument was improper under the circumstances of this case and existing law. See Bigbee, 885 S.W.2d at 812.

The defendant also asserts that the prosecutor improperly commented on the defendant's failure to testify. Griffin v. California, 380 U.S. 609, 85 S. Ct. 1229 (1965). After reviewing the record, we conclude that this claim is unfounded. Though the defendant did not testify in the guilt phase, he did take the stand in the sentencing phase. The comments of the prosecutor during the sentencing phase did not suggest that the defendant did not testify, but rather that he said he was sad rather than sorry that the killing happened.

Finally, the defendant argues that the prosecutor's criticism of the defendant's demeanor and the prosecutor's use of sarcasm while alluding to the defendant were improper. See United States v. Schuler, 813 F.2d 978, 982 (9th Cir. 1987); United States v. Doe, 860 F.2d 488, 492 (1st Cir. 1988); Lindsey v. Smith, 820 F.2d 1137, 1155 (11th Cir. 1987). However, we see no problem with the prosecutor's argument. Demeanor is a relevant consideration in the context of the defendant's claim of remorse. Likewise, attorneys are allowed to engage in "oratorical emphasis in arguing their respective positions," and jury argument is given wide latitude within the trial court's discretion. State v. Prince, 713 S.W.2d 914, 918 (Tenn. Crim. App. 1986); State v. Sutton, 562 S.W.2d 820, 823 (Tenn. 1978). This would include the use of irony and sarcasm for the purpose of making relevant points. We believe that the

prosecutor's argument about which the defendant complains was based upon relevant considerations.

## INSTRUCTIONS

### Nonunanimous Verdict

The defendant argues that the jury was unconstitutionally instructed that a life verdict had to be unanimous, was not instructed of the effect of a nonunanimous verdict, and was unconstitutionally given instructions that precluded the full consideration of mitigating evidence. The defendant's arguments under similar circumstances have been repeatedly rejected by our supreme court. See State v. Brimmer, 876 S.W.2d 75, 82-83, 87 (Tenn. 1994); State v. Cazes, 875 S.W.2d 253, 267-68 (Tenn. 1994), State v. Smith, 857 S.W.2d 1, 17, 21-23 (Tenn. 1993); State v. Barber, 753 S.W.2d 659, 670-71 (Tenn. 1988).[9] Accordingly, this issue is without merit.

### Parole Eligibility

The defendant contends that the trial court should have instructed the jury on the particular dates of the defendant's parole eligibility. The defendant claims that had the jury known that the defendant would not have been eligible for parole for at least forty-eight (48) years, it could have made a more informed decision about the defendant's sentence.[10] Our supreme court has addressed the defendant's contention:

> Neither the Tennessee Constitution nor the Federal constitution prohibits or requires informing a capital sentencing jury of relevant and accurate sentencing information. . . . We are of the opinion that to provide a jury with the sort of information requested by the [defendant] could result in

---

[9] The defendant further contends that we should reconsider the holding in State v. Smith, 857 S.W.2d 1 (Tenn. 1993), to the effect that there is no reasonable probability that jurors interpret instructions on unanimity so as to preclude the full consideration of a defendant's mitigating evidence. He relies on an opinion from a federal district court that believes that there is such a probability. See Houston v. Dutton, No. 3:86-0749, slip op. at 41-48 (M.D. Tenn. May 19, 1994). Obviously, we are bound by our supreme court's decisions.

[10] The defendant cites to Simmons v. South Carolina, 512 U.S. 154, 114 S. Ct. 2187 (1994). The law in Tennessee at the time of the present trial, however, did not provide for life without parole. See T.C.A. § 39-13-202(b) (1991). Accordingly, the holding in Simmons would not be applicable to this case.

49

> sentences of death based on sheer speculation and on factors other than those enumerated in [the statute] and sanctioned under either Constitution.

Smith, 857 S.W.2d at 11 (citations omitted). "A greater defect in such instructions stems from the fact that jurors tend to attempt to compensate for future clemency by imposing harsher sentences, which is certainly a matter of prejudice to a defendant." Id. This issue is without merit.


## CONSTITUTIONALITY OF DEATH PENALTY STATUTES
## AND THEIR APPLICATION

The defendant makes myriad attacks upon the constitutionality of the death penalty and the Tennessee statutes providing for it, and its application in this case. We need not itemize all of them in this opinion. Our supreme court has rejected all of his claims regarding the death penalty and how our statutes and procedures allow for its imposition. See, e.g., State v. Black, 815 S.W.2d 166, 178-79, 85-91 (Tenn. 1991); State v. Brimmer, 876 S.W.2d 75, 88 (Tenn. 1994); State v. Cazes, 875 S.W.2d 253, 270-71 (Tenn. 1994); State v. Van Tran, 864 S.W.2d 465, 481-82 (Tenn. 1993); State v. Smith, 857 S.W.2d 1, 23 (Tenn. 1993); State v. Thompson, 768 S.W.2d 239, 252 (Tenn. 1989); see also State v. Cribbs, supra, slip op. at 24-25.

As for the issue of the death penalty being properly applied to the defendant, our review of the record and other similar cases leads us to conclude that the nature of the crime and the defendant adequately justify the sentence imposed by the jury. The evidence in the light most favorable to the state supports a conclusion that the defendant intended to kill the victim and that his denial was less than candid. Such a repeat violent offender, for whom almost no mitigating circumstances are shown in the record, would typically fall within the class of felony murderers who receive the death penalty in this state. Cf. State v. Branam, 855 S.W.2d 563, 570-71 (Tenn. 1993).

## ENHANCEMENT FACTORS FOR ROBBERY

The defendant asserts that the trial court improperly considered enhancement factors that were essential elements of the offense when it sentenced him to twenty years for especially aggravated robbery. The state concedes as much, although not identifying which ones it concedes. In reviewing the sentence imposed by the trial court, we are to conduct a <u>de novo</u> review on the record, and such review "shall be conducted with a presumption that the determinations made by the court from which the appeal is taken are correct." T.C.A. § 40-35-401(d). However, "[i]f the trial court applies inappropriate factors or otherwise fails to follow the 1989 Sentencing Act, the presumption of correctness falls." <u>State v. Shelton</u>, 854 S.W.2d 116, 123 (Tenn. Crim. App. 1992).

The trial court applied the following seven enhancement factors as they are provided in T.C.A. § 40-35-114:

> (1) The defendant has a history of criminal convictions or behavior.
>
> (2) The defendant was a leader of others in the commission of the offense.
>
> (6) The defendant inflicted particularly great personal injuries upon the victim.
>
> (9) The defendant employed a firearm during the offense.
>
> (10) The defendant had no hesitation in committing a crime involving a high risk to life.
>
> (12) The defendant willfully inflicted bodily injury upon another person.
>
> (16) The defendant committed the offense under circumstances showing a great potential for bodily injury to the victim.

As a general rule, factors that are elements of a crime or are inherent in the crime cannot be used. <u>See</u> T.C.A. § 40-35-114; <u>State v. Jones</u>, 883 S.W.2d 597, 599-600 (Tenn. 1994).

Thus, to the extent that an especially aggravated robbery requires the use of violence or fear of violence, the use of a deadly weapon, and the infliction of serious bodily injury, see T.C.A. § 39-13-403, those circumstances are inapplicable for enhancement purposes. This means that the use of a deadly weapon, the infliction of particularly great injuries, the risk to life, and the existence of a great potential for bodily injury -- as they exist in all especially aggravated robberies -- cannot enhance punishment for the especially aggravated robbery in this case.

However, to the extent the circumstances of the crime reflect a greater range of risk or greater culpability relative to certain factors, they may apply in a particular case. See Jones, 883 S.W.2d at 603. In this respect, the evidence of the shootings occurring near to and into occupied dwellings would allow the use of factor (10) relative to involving the high risk to life presented to persons other than the victim. Likewise, because an especially aggravated robbery does not require the willful infliction of bodily injury upon another person, factor (12) applies.

In any event, the fact that factors (6), (9) and (16) do not apply does not necessarily translate into a reduction in the sentence imposed by the trial court. The burden remains upon the defendant to show that the sentence imposed was unjustified. See State v. Holland, 860 S.W.2d 53, 60 (Tenn. Crim. App. 1993). The defendant was previously convicted of similar crimes and acted in concert with others to aid in his commission of the offense and his leaving the scene. With no applicable mitigating factors, we hold that these circumstances give weight to the remaining factors so as to justify the midrange sentence of twenty years for the Class A felony involved.[11] The sentence is affirmed.

---

[11] We note that the presumptive sentence for Class A felonies on or after July 1, 1995, is twenty years if there are neither enhancing nor mitigating factors present. See T.C.A. § 40-35-210.

## CONSECUTIVE SENTENCES

The defendant contends that the imposition of consecutive sentences was improper in this case because: (1) the term "extensive" when used to modify criminal history in T.C.A. § 40-35-115 is unconstitutionally vague; (2) the defendant does not have any prior juvenile convictions; (3) the use of juvenile criminal activity in considering the imposition of consecutive sentences is improper; and (4) the defendant is not a danger to society.

The predicate factors for determining whether to impose consecutive sentences are provided in T.C.A. § 40-35-115. The trial court found that the defendant had an extensive history of criminal activity and that he was a dangerous offender whose behavior indicates little or no respect for human life. See T.C.A. § 40-35-115(b)(2) and (4). The defendant's contentions as to the impropriety of these findings are without merit. The defendant cites no authority in support of his proposition that the term "extensive" is unconstitutionally vague. The trial court properly considered the defendant's prior criminal activity as being extensive. Though the defendant may not have any prior juvenile convictions, the statute does not state that there must be a conviction, just prior criminal activity. Furthermore, State v. Stockton, 733 S.W.2d 111, 112-13 (Tenn. Crim. App. 1986), suggests that the trial court can review juvenile records when making a sentencing determination. Finally, the defendant was properly classified as a dangerous offender. See State v. Wilkerson, 905 S.W.2d 933, 935-39 (Tenn. 1995). Accordingly, this issue is without merit.

## CONCLUSION

In consideration of the foregoing and the record as a whole, we hold that the first degree murder conviction is affirmed but that the sentence is reversed. We affirm the judgment of conviction for the especially aggravated robbery. The case is

53

remanded to the trial court for a new sentencing hearing for the first degree murder and the entry of a judgment of conviction under count two of Case No. 92-04081.

_____
Joseph M. Tipton, Judge

CONCUR:

_____
Joe B. Jones, Presiding Judge

_____
John K. Byers, Senior Judge