STATE of Tennessee, Appellee,

v.

Orion PRINCE, Appellant.

Court of Criminal Appeals of Tennessee, at Nashville.

Jan. 28, 1986.

Permission to Appeal Denied by Supreme Court May 5, 1986.

John H. Norton, III, Norton & Associates, (on appeal only), Randal T. Wilson, Wilson & Associates, (on appeal only), Marvin E. Gordon, (at trial only), Shelbyville, for appellant.

W.J. Michael Cody, Atty. Gen., Kevin Steiling, Asst. Atty. Gen., Nashville, James S. Kidd, Dist. Atty. Gen., Fayetteville, John C. Bomar, Asst. Dist. Atty. Gen., Shelbyville, for appellee.

OPINION

SCOTT, Judge.

The appellant was convicted of selling a Schedule II controlled substance (hydromorphone) and received a sentence of ten years in the state penitentiary as a Range II, especially aggravated offender. He was also ordered to pay a $15,000.00 fine. On appeal the appellant has presented four issues.

In the first issue the appellant questions whether the trial judge abused his discretion in denying his request to voir dire each prospective juror individually concerning the alleged effects of pre-trial publicity.

During the course of the court's voir dire of the entire venire, the trial judge inquired as to whether anyone knew anything about the facts of the case. All veniremen responded negatively. He then inquired whether anyone had talked to any of the prospective jurors about the case. Again he received a negative response. Then the following occurred.

THE COURT: Let me ask you a question: Let me see a show of hands by those who knew prior to today—prior to today—that this particular case would be the one that would be tried today? Would you raise your hand if you knew it?

(Prospective jurors raise hands.)

THE COURT: All right. We've got several people here.

Now, from what source—don't tell me what you've heard, but what was the source? Was it in the paper?

PROSPECTIVE JUROR: Last night's paper.

THE COURT: Last night's paper?

PROSPECTIVE JUROR: Also, it was in the paper last week.

THE COURT: In what?

PROSPECTIVE JUROR: In the paper last week—the Times Gazette.

THE COURT: In the paper. All right. Now, that brings on another question that I should ask about.

With all due respect to our newspaper people, it seems like to me—They don't know anything about legal proceedings apparently, because they can't ever get the reporting of what happens in a courtroom correctly stated. And, I don't understand why; but it's very difficult for them. I don't think they understand legal principles, legal procedures, and that sort of thing.

And, so many times I can go to Court one day and be there all day long, and read the account of the paper the next day and I'll wonder, "Now, I wonder where that fellow was, because he certainly wasn't in the courtroom where I was." Because, there is nothing that he has reported that's even close to what actually transpired.

And the law merely provides or says, you cannot try—it's too important a matter; that is, our personal freedom, it's too important a matter to be tried on opinions, what somebody might think, what might be in the newspaper or what others might think about the case. Those have nothing to do with the guilt or innocence. Our system is a system of law. And, anyone who is convicted must be convicted under the rules of the law. And the law clearly provides that newspaper accounts or whatever is in the newspaper cannot and must not be considered in the trial of a case.

Now, the sixty-four dollar question I guess is—those of you who have read something about it—do you feel that whatever—I didn't see the paper—but whatever might have been there, do you feel that that will have a bearing upon your verdict in this case?

In other words, you must be able as a juror, if you have read something about it in the paper, you, as a juror, must be able to put that aside and listen to the proof as it comes from the witness stand; and from that proof, and that proof alone, render your verdict, and not let what you might have heard or what you might have read interfere with that decision.

Let me ask this question: Those of you who read something about it in the paper, did you form or express any opinion as to the guilt or innocence of the defendant upon the charge or charges? Please raise your hand if you formed an opinion about it.

(No prospective juror raises hand.)

THE COURT: No one has formed an opinion. Well, did any of you maybe express an opinion—say to your wife or someone around when you were reading the paper? State an opinion one way or the other? If so, just raise your hand?

(No prospective juror raises hand.)

THE COURT: Very well. Then those of you who read something about it in the paper, will you promise—not only the Court—but the individuals involved, the parties—the people involved—the State on the one side, the defense on the other—that you will not let that have anything to do with your verdict; but that you will give both sides a fair and an impartial trial; and you will try the case solely and alone on what is presented during the hearing; that is, in the courtroom? Can all of you do that, or can you think of some reason why you could not do that?

(No response from any prospective juror.)

The defense counsel then moved for individual voir dire which was denied. Subsequently, the first twelve prospective jurors were seated and defense counsel asked the following questions and received the following answers:

Q. Let me ask you this, ladies and gentlemen, and I want to phrase this very carefully. In the Judge's pre-examination of you as prospective jurors, it came out through several of you that you had read a newspaper account, I believe yesterday, which advised you—and correctly so—that this matter was set for trial today. Have any of you been aware of any—Do any of you remember any publicity through the newspaper, the radio or accounts from friends in regard to this charge and this man, say in the last ninety days?

A. (No response from any prospective juror.)

Q. Do any of you remember any newspaper publicity, gossip where you work, radio announcements in regard to him, and anything that might be even connected with this charge?

A. (No response from any prospective juror.)

Q. None of you have any memory that ties you to him other than what happened in yesterday's paper, which His Honor has already covered?

A. (No response from any prospective juror.)

MR. GORDON: Your Honor, we—

THE COURT: Excuse me. Let me ask a question.

MR. GORDON: All right.

THE COURT: Who do we have on the jury that read the paper yesterday? Anybody?

(Prospective jurors raise hands.)

THE COURT: Well, we've got one, two, three, four, five—five.

MR. GORDON: Five.

THE COURT: I didn't know whether any of them were called or not. Everybody didn't raise their hands; but apparently five read the paper.

MR. GORDON: Yes, I knew we had one or two, but my memory is not good enough to line all five of them up. I just knew we had some.

THE COURT: Yes. I didn't know. That's the reason I asked.

MR. GORDON: And, of course, the other prospective jurors are present and listening, I'm sure, Your Honor. That's the reason I stated my question generally. We will pass the jury at this time, if it, please, the Court.

As challenges were exercised, various prospective jurors were then excused and various other prospective jurors were seated until the jury was finally accepted. However, there was no further questioning concerning media exposure.

Relying on *Sommerville v. State,* 521 S.W.2d 792 (Tenn.1975), the appellant contends that the inquiry by the trial judge was inadequate and that he was entitled to individual voir dire as a matter of right. In *Sommerville,* the defendant was facing a retrial after his first conviction was reversed. During voir dire examination, nine of the jurors admitted having read a newspaper article that the defendant had been convicted and (as erroneously reported) received a sentence of twenty years and a day. The court held that "a juror with knowledge of the verdict and sentence of the prior jury shall be subject to challenge for cause, unless the examination shows,

unequivocally, that he can be impartial, and that his judgment will not be affected by such knowledge." *Id.*, 521 S.W.2d at 797. The court continued:

> Further, with respect to the method of examination, whenever there is believed to be a significant possibility that a juror has knowledge of the jury verdict at a prior trial, or has been exposed to other potentially prejudicial material, the examination of each juror, with respect to his exposure, shall take place outside the presence of other chosen and prospective jurors. *Id.*

*Sommerville* is distinguishable from this case. In that case there was circumstantial evidence of vindictiveness by the jurors, since at the second trial they meted out a punishment, which was even stiffer than the erroneously reported penalty. In this case there was no evidence that there was any potentially prejudicial pre-trial publicity at all. The record does not even reveal what the pre-trial publicity was, except that the setting of the case was mentioned in the local newspaper.

Jurors need not be totally ignorant of the facts of the case. Even if a juror admits to having formed an opinion on the merits, the juror may still be qualified if he or she is able to lay aside that opinion and render a verdict based upon the evidence presented in court. *State v. Sammons*, 656 S.W.2d 862, 869 (Tenn.Cr.App.1982). Even if a juror has read about the case in a newspaper, the juror need not be excused for cause if it appears that he is "indifferent as between the state and the defense," that he will follow the law, and that he will decide the case on the evidence presented at trial. *Manning v. State*, 155 Tenn. 266, 292 S.W. 451, 455 (1927). Of necessity, the trial judge has wide discretion in passing upon the qualifications of jurors, and appellate courts must indulge the presumption that the trial court has but one purpose in mind, "to assure a fair and impartial trial before an unprejudiced and competent jury." *Vines v. State*, 190 Tenn. 644, 231 S.W.2d 332, 334 (1950).

In this case the prospective jurors indicated no prior knowledge of the facts in issue, and there was absolutely no showing that there was any prejudicial pretrial publicity. The judge instructed the venire at length concerning their responsibility to disregard newspaper accounts and to decide the case solely on the basis of the evidence presented at trial. The trial judge did not abuse his discretion in denying individual voir dire. This issue has no merit.

■ In the next issue the appellant contends that the evidence preponderated in favor of a finding of "casual exchange" of a small amount of a controlled substance among friends rather than a felonious sale.

On January 19, 1983, agents of the Tennessee Bureau of Investigation met at Bell Buckle, Tennessee with James Howard Bowen and wife, Gayle Bowen. The Bowens were addicted to hydromorphone, sold under the trade name Dilaudid, and they had indicated their willingness to cooperate with the TBI to effect a "controlled purchase" of the drug. Mr. Bowen was searched, a radio transmitter was hidden on his body and he was given three one hundred dollar bills. The money belonged to the State and the TBI agents had recorded the serial numbers of the bills.

Shortly after 1:00 P.M. that day, Mr. Bowen went to the appellant's residence. Mrs. Bowen waited outside in the car and the TBI agents waited a short distance away. The TBI agents monitored and recorded the radio transmissions. Mr. Bowen and the appellant discussed Mr. Bowen's need and desire to purchase twelve Dilaudids. However, no sale was then consummated, since the appellant said he did not have any. However, he expected to obtain some later that day from his supplier who was traveling through on his way to Florida.

About two hours later Mrs. Bowen went to the appellant's residence with the same three one hundred dollar bills and a man's diamond ring. She, likewise, was searched and wired with the body transmitter and her conversations with the appellant were also recorded. She successfully negotiated

the purchase of ten Dilaudid tablets and paid the appellant with the three one hundred dollar bills. She also left the diamond ring as advance payment for ten more Dilaudid tablets that were to be delivered later.

Several hours later the TBI agents, armed with an arrest warrant and a search warrant, went to the appellant's home. There he was arrested and a total of $2,801.90 was taken from his person. Found in his wallet were the three one hundred dollar bills that the TBI had provided to Mrs. Bowen.

The record contains no mention of friendship or any other motive for the transfer except money. There was not a shred of evidence that it was anything except a sale.

It may be inferred from a casual exchange of a "small amount" of controlled substances that they were not possessed for the purpose of sale. TCA § 39–6–417(a)(2).

Whether a transfer was "casual exchange" is to be determined from all the facts and circumstances of the case. *State v. Helton*, 507 S.W.2d 117, 121 (Tenn.1974).

A jury verdict of guilty, approved by the trial judge, accredits the testimony of the state's witnesses and resolves all conflicts in favor of the theory of the state. *State v. Hatchett*, 560 S.W.2d 627, 630 (Tenn. 1978). On appeal the state is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences which may be drawn therefrom. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn.1978).

There was ample, indeed overwhelming, evidence from which any rational trier of fact would conclude that the appellant was guilty of *selling* the drugs to Mrs. Bowen beyond a reasonable doubt, not providing them to her as a friendly gesture or casual exchange. Rule 13(e), T.R.A.P., *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 2786–2792, 61 L.Ed.2d 560 (1979). This issue has no merit.

■ In the next issue the appellant contends that the trial judge erred by permitting the Assistant Attorney General, over objection, to refer to him in his closing argument as a "dope dealer," "dope peddler," and a "dope seller."

In our adversary system of justice, attorneys are allowed to engage in oratorical emphasis in arguing their respective positions to the jury. They are given "wide latitude" in their arguments, and the trial judge's supervision of the oratory will not be reversed absent an abuse of discretion. *State v. Sutton*, 562 S.W.2d 820, 823 (Tenn. 1978). The prosecutor's argument must be temperate, based on the evidence introduced at the trial and pertinent to the issues being tried. *Russell v. State*, 532 S.W.2d 268, 271 (Tenn.1976).

The colloquial expressions used by the prosecutor referred to the actual charges on trial. They were based on the evidence introduced at trial and pertinent to the issues being tried. The isolated use of this terminology was temperate and was a proper characterization of the appellant based upon the evidence. It is not error to argue that which is warranted by reasonable inference from the evidence adduced at trial. *State v. Beasley*, 536 S.W.2d 328, 339 (Tenn.1976). These words were mild indeed compared to some of the other more highly prejudicial remarks which this Court and the Supreme Court have reviewed. *See: Self v. State*, 527 S.W.2d 153, 155 (Tenn.Cr.App.1975) (Where the prosecutor referred to a defendant charged with assault with intent to commit murder in the first degree as an animal who lived in a hut, this Court found no error.); *Russell v. State*, supra (Where in closing argument, without any evidence to support the allegation, the prosecutor disparaged the murder defendant's insanity defense, the Supreme Court reversed, holding that it created a "spectre of conspiracy, deceit and worse" on the part of psychiatric personnel.); and *Smith v. State*, 527 S.W.2d 737, 738–739 (Tenn.1975) (Where the prosecutor alluded to evidence which was known only to him and which he could not reveal, the remarks amounted to a hint that a lengthy sentence would postpone parole. Based on these

remarks, the Supreme Court reassessed the sentence.)

The prosecutor's remarks in this case were not unfairly prejudicial. In fact, our Supreme Court has referred to an individual as a "drug peddler." *State v. Helton,* supra. Therefore, it is unnecessary to reach the issues of whether curative instructions were required or whether the remarks affected the verdict. *State v. Sutton,* supra. This issue has no merit.

 In the final issue the appellant contends that the trial judge erred in his charge regarding the necessity of a fine against the appellant after his conviction. In accordance with defense counsel's request, the trial judge submitted the issue of a fine to the jury in a bifurcated procedure, after the jury reported its verdict. The trial judge's complete instruction to the jury was as follows:

> Members of the jury: It is now necessary for you to set the fine of the defendant for some amount not to exceed fifteen thousand dollars ($15,000). Any imprisonment will be determined and fixed by the Court.

> You may now retire to fix the fine in this case in the space provided below.

The appellant contends that the trial judge's instruction *required* the jury to fix a fine while the statute provides that the jury *may* assess a fine. TCA § 39–6–417(a)(1)(B).

We agree with the appellant's contention regarding the charge. It was clearly inadequate to convey to the members of the jury the range of discretion which they possessed. In view of the absolutely overwhelming evidence of the appellant's guilt, the conviction is affirmed, but the judgment is modified to delete the imposition of the fine. Should the State not accept the deletion of the fine, the case will be remanded for a new trial, solely on the issue of the amount of the fine, if any, under the procedures set forth in *Huffman v. State,* 200 Tenn. 487, 292 S.W.2d 738, 743 (1956).

The judgment is affirmed as modified.

DAUGHTREY and BYERS, JJ., concur.