IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs October 17, 2000

## STATE OF TENNESSEE v. CARLOS DEMETRIUS HARRIS

**Appeal from the Criminal Court for Hamilton County
No. 220706     Stephen M. Bevil, Judge**

**No. E2000-00718-CCA-R3-CD
January 4, 2001**

The Defendant, Carlos Demetrius Harris, appeals as of right from his reckless homicide conviction. On appeal, he presents the following six issues: (1) whether the trial court erred by granting the State's motion to amend the indictment from voluntary manslaughter to reckless homicide; (2) whether the trial court erred by allowing inadmissible items into evidence; (3) whether the trial court erred by not allowing testimony by the Hamilton County Medical Examiner that an ordinary person would be unaware that one blow to the head would cause death; (4) whether the trial court erred by granting the State's jury instruction request regarding causation and intent; (5) whether the evidence was sufficient to support the conviction; and (6) whether the trial court erred by sentencing the Defendant to a term of six years and by denying the Defendant alternative sentencing. We find no reversible error; accordingly, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed.**

DAVID H. WELLES, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, J. and William B. Acree, Jr., Sp.J., joined.

Cynthia A. LeCroy-Schemel, for the appellant, Carlos Demetrius Harris.

Paul G. Summers, Attorney General and Reporter; R. Stephen Jobe, Assistant Attorney General; Bill Cox, District Attorney General; and Barry Steelman and Christopher Poole, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

The proof at trial established that the Defendant loaned the victim, Charles Freeman, thirty dollars on February 22, 1998. The Defendant had previously loaned money to Mr. Freeman, and Mr. Freeman had always repaid the money in a timely fashion. However, on February 23, 1998, when the Defendant asked Mr. Freeman about the money, Mr. Freeman gave the Defendant the "runaround."

Mr. Freeman and the Defendant secured a ride to Mr. Freeman's residence with two acquaintances of the Defendant, Mary Mangram and Felicia Jones. Mr. Freeman lived with his mother, Essie Freeman. Mr. Freeman got out of the car and went inside, leaving the other three individuals in the car. When Mr. Freeman went inside, he talked to his mother. Essie Freeman told her son that he could no longer live with her because he had a drug problem, but she agreed to let him stay until the following Friday. After that, Mr. Freeman went back outside, and he asked the Defendant to join him behind the car.

Both Mary Mangram and Felicia Jones testified that they were not paying attention to the Defendant and Mr. Freeman; instead, they were attempting to operate the cassette player. However, both of them heard a loud noise, like a "lick" or a "pow," as though something had been hit. Ms. Mangram then heard a woman yell, "Stop that, stop that." Ms. Jones testified that she heard a woman yell, "Get back in that car, get out from here, get back in that car." The Defendant got in the car, and Ms. Mangram drove away. She testified that the Defendant did not say anything about what happened. He just asked for a cigarette.

Essie Freeman testified that she was looking out her front window after her son left her house on February 23, 1998. She saw her son and another man talking, and she said that they appeared to be "flustered." At one point, the man hit Mr. Freeman in the head, and Mr. Freeman fell to the ground. Ms. Freeman testified that she did not see her son raise his hand to the man or attempt to touch him prior to the man striking her son.

Paramedics responded to the scene, where they discovered that Mr. Freeman had a pulse but was not breathing. On the way to the hospital, Mr. Freeman experienced cardiac arrest. He ultimately died as a result of his injuries.

Dr. Frank King, the Hamilton County Medical Examiner, testified that Mr. Freeman's death was caused by blunt force trauma to the head. He explained that the head injury consisted of multiple fractures of the skull and injury to the brain. The location of the skull fractures and the brain injury indicated that the injuries were caused by a sudden movement of the head going back with the face going upward. Dr. King also testified that there were secondary injuries to the back of the head caused by a second impact. Dr. King agreed with counsel that a possible explanation for the injuries would be that Mr. Freeman was struck in the head, causing the first injuries, and then his head hit the pavement, causing the secondary injuries. Dr. King admitted that the extent of injury caused by a blow to the head in any particular individual is difficult to predict; what might cause death in one person might not harm another person at all.

Dr. King testified that Mr. Freeman tested positive for cocaine, which would tend to stimulate a person's nervous system. Dr. King agreed that cocaine could make a person agitated and aggressive, but he asserted that the effect of cocaine on any particular person could not be determined by a laboratory test. In addition, Dr. King testified that he observed Mr. Freeman's fingernails, and they did not show signs of foreign material such as skin, hair, or fiber.

When Mary Mangram learned that Mr. Freeman had died, she went to the police and informed them about the incident. The Defendant was arrested as a result, and he gave a statement to the police which was recorded and played for the jury. In that statement, the Defendant admitted striking Mr. Freeman one time on the head. However, he claimed that he did so in self-defense. He said that Mr. Freeman "grabbed" him. He showed the police his neck and face, which had scratches on them. The police made pictures of the Defendant's neck and face, which were shown to the jury.

## I. AMENDMENT OF INDICTMENT

The Defendant first argues that the trial court erred by granting the State's motion to amend the indictment to reflect a charge of reckless homicide rather than voluntary manslaughter. The Defendant asserts that he was "highly prejudiced" by the amendment because it occurred only a couple of weeks prior to trial and completely changed the offense and the elements. However, the Defendant did not present this issue in his motion for a new trial. Therefore, this issue has been waived. See Tenn. R. App. P. 3(e); State v. Clinton, 754 S.W.2d 100, 103 (Tenn. Crim. App. 1988).

Notwithstanding, we have considered this issue, and we find that it lacks merit. Rule 7(b) of the Tennessee Rules of Criminal Procedure provides that an indictment may be amended in all cases with the consent of the defendant, and if no additional or different offense is charged and if no substantial rights of the defendant are prejudiced, the indictment may be amended without the defendant's consent before jeopardy attaches. While there is no evidence in this record regarding whether the Defendant did or did not consent to the amendment of the indictment, we conclude that the amendment was proper whether or not the Defendant consented because the amendment did not charge an additional offense, and the substantial rights of the Defendant were not prejudiced.

When a person is charged with an offense, that person is also charged with all lesser offenses included within that offense. See Strader v. State, 362 S.W.2d 224, 227 (Tenn. 1962). A trial court is under the mandatory duty to instruct the jury on the offense charged and any lesser included offenses. Tenn. Code Ann. § 40-18-110(a). In this case, the Defendant was originally charged with the offense of voluntary manslaughter, which is "the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Id. § 39-13-211. The indictment was amended to reflect a charge of reckless homicide, which is "a reckless killing of another." Id. § 39-13-215. Pursuant to State v. Burns, 6 S.W.3d 453 (Tenn. 1999), an offense is a lesser included offense if

(a) all of its statutory elements are included within the statutory elements of the offense charged; or
(b) it fails to meet the definition in part (a) only in the respect that it contains a statutory element or elements establishing
(1) a different mental state indicating a lesser kind of culpability . . . .
Id. at 466-67.

Reckless homicide contains two elements: the killing of another and reckless conduct. See Tenn. Code Ann. § 39-13-215. Obviously, the killing of another is included within the offense of voluntary manslaughter. While the element of reckless conduct is not technically included within the elements of voluntary manslaughter, which requires intentional or knowing conduct, the element of reckless conduct does establish a different mental state indicating a lesser kind of culpability. See Tenn. Code Ann. §§ 39-11-301(a)(2), 39-11-302. Therefore, reckless homicide is a lesser included offense of voluntary manslaughter under part (b) of the Burns test.[1] Because reckless homicide is a lesser included offense of voluntary manslaughter, the Defendant was necessarily charged with reckless homicide when he was charged with voluntary manslaughter. It follows that he would have had to prepare a defense to reckless homicide as well as voluntary manslaughter. Thus, the amendment to the indictment did not charge a new offense, and the Defendant's rights were not prejudiced. Accordingly, we find no error.

## II. INADMISSIBLE EVIDENCE

Next, the Defendant claims that the trial court erred by allowing inadmissible items into evidence which resulted in denying the Defendant a fair trial. He asserts that each of these errors standing alone requires reversal and that the cumulative effect of the errors require reversal. Specifically, he complains (1) that the trial court allowed the jury to observe the Defendant being brought from the holding cell; (2) that the trial court informed the jury that the Defendant was in custody and was appointed a lawyer; (3) that the Defendant's statement which was played for the jury improperly made reference to the Defendant's driver's license being suspended; and (4) that a State's witness improperly made reference to "pulling" the Defendant's record, thereby indicating that the Defendant had a criminal record. We will first address the Defendant's contentions separately, and then consider any cumulative effect.

Unfortunately, the record regarding the jury observing the Defendant being brought into the courtroom from the holding cell is sparse. The only reference to that occurring was a comment made by defense counsel approximately half-way through the jury voir dire, in which counsel stated,

> Judge, before we bring the jury back in I just want to put one thing on the record, that we had had the conversation up at the bench earlier in terms of my objection of the jury being in here at the time of the other items that were going on and to see Mr. Harris come from out of the holding cell area and being -- also in terms of being informed that he was in custody and I was an appointed attorney as well, just for the purposes of the record.

---

[1]Although finding that reckless homicide is a lesser included offense under part (b) of the Burns test, we note that pursuant to statute, "[w]hen recklessness suffices to establish an element, that element is also established if a person acts intentionally or knowingly." Tenn. Code Ann. § 39-11-301(a)(2). Thus, a compelling argument could be made that reckless homicide is a lesser included offense under part (a) of the Burns test because all of the elements are included within the elements of the greater offense. See State v. Jumbo Kuri, No. M1999-00638-CCA-R3-CD, 2000 WL 680373, at *5 (Tenn. Crim. App., Nashville, May 25, 2000).

The trial court overruled the objection, commenting that it did not believe those actions would have any effect on the jury.

In the recent case of <u>State v. Marlon D. Beuregard</u>, No. W1999-01496-CCA-R3-CD, 2000 WL 705978 (Tenn. Crim. App., Jackson, May 26, 2000), we considered a similar issue. In that case, the defendant was brought into the courtroom from the holding cell by two sheriff's deputies while the prospective jurors were in the courtroom. <u>Id.</u> at *8. While acknowledging the cases which hold that a defendant should not be forced to wear prison clothes or shackles during trial, we noted that the defendant was neither shackled nor in prison clothes and was not restrained in any way; he was merely escorted into the courtroom from a side door rather than permitted to use the door available to the general public. <u>Id.</u> Finding no evidence of prejudice in the record, we determined that there was no reason to set aside the trial court's order overruling the defendant's objection to the manner in which he was brought into the courtroom. <u>Id.</u> at 9. We reach a similar result in this case as well. There is no evidence that the Defendant was shackled or in prison clothes. There is no evidence that the jury had a negative impression or reaction to seeing the Defendant come through a side door rather than the door open to the public. Without evidence of prejudice, we see no reason to set aside the trial court's ruling.

The Defendant also complains because the trial judge informed the jury that he was incarcerated and that he had an appointed attorney. During jury voir dire, the trial judge began to ask the prospective jurors typical questions concerning their knowledge of the parties and of the case. During this process, the judge commented to the jury that Ms. Cynthia Lecroy-Schemel had been appointed to represent the Defendant and that the Defendant was incarcerated because he could not make bond. The trial judge then asked the jurors,

> Would any of you hold it against him because he could not make bond in this case and he's not like somebody who can make bond and is out in the community? You shouldn't hold that against him but I need to ask you those things to make sure that if there's any thought at all you need to get that out of your mind at this time.
>     Can you give Mr. Harris the same treatment as you could anyone who, for example, hired his own attorney and was able to make bond?

The Defendant did not object at the time, but later, during a recess, the Defendant made an objection on the record in which he objected to the manner in which he was brought into the courtroom, and he objected to the prospective jurors being told that he was incarcerated and that he had an appointed attorney. The trial judge overruled the Defendant's objections, finding that this information would not affect the jury. On appeal, the Defendant asserts, "One could conclude as a juror that the Defendant must be guilty since he was in custody and could not hire his own attorney."

"It is the duty of the trial judge to participate in the examination of prospective jurors." <u>State v. Irick</u>, 762 S.W.2d 121, 125 (Tenn. 1988); <u>see also</u> Tenn. R. Crim. P. 24(a). The trial judge is given wide discretion in conducting the voir dire examination of potential jurors, and that discretion will not be disturbed absent an abuse thereof. <u>Irick</u>, 762 S.W.2d at 125. "[A]ppellate courts must

indulge the presumption that the trial court has but one purpose in mind, 'to assure a fair and impartial trial before an unprejudiced and competent jury.'" State v. Prince, 713 S.W.2d 914, 917 (Tenn. Crim. App. 1986) (quoting Vines v. State, 231 S.W.2d 332, 334 (Tenn. 1950)). We believe that by questioning the jurors on their ability to give the Defendant a fair trial when he was incarcerated and when he had an appointed attorney, the trial judge was simply trying to assure the Defendant a fair and impartial trial. Unlike cases in which a jury venire is informed of extraneous information such as a defendant's prior criminal activity, see e.g., State v. Scruggs, 589 S.W.2d 899, 900-01 (Tenn. 1979), the prospective jurors in this case were informed only of the Defendant's present condition in relation to the current charges. They all indicated that they could give the Defendant a fair trial and that they would not hold against him the facts that he was incarcerated and that he had an appointed attorney. Accordingly, we find no error.

The Defendant next argues that the trial court should have redacted his statement, in which the police detective made reference to the Defendant's driver's license being suspended, because the reference indicated non-compliance with the law, which would prejudice the jury against him. The trial court did order portions of the Defendant's statement redacted, such as references to the Defendant's prior arrests, but the court declined to redact the following portion of the statement:

> [Detective]: How do you get around town? Do you drive? I mean I know your license [sic] suspended, I'm not trying to get you up on that.
> [Defendant]: No, no. I mostly ride.
> [Detective]: How did you get from your girlfriend's out to . . . Duncan Avenue to meet up with Mr. Freeman?

In declining to redact this portion of the statement, the trial court noted that a driver's license may be suspended for reasons other than criminal convictions.

The admissibility of evidence is a matter within the sound discretion of the trial court, and this Court will not disturb the trial court's ruling absent a clear showing of an abuse of that discretion. See State v. Cauthern, 967 S.W.2d 726, 743 (Tenn. 1998); State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978). We cannot say that the trial court abused its discretion by refusing to redact that portion of the Defendant's statement. Although hearsay, the Defendant's statement was admissible as an admission of a party opponent. See Tenn. R. Evid. 803(1.2). While we question the relevance of the detective's statement regarding the Defendant's driver's license, the Defendant's version of the events in question — including how he came to be in Mr. Freeman's company that day — was undoubtedly relevant to his guilt or innocence. See Tenn. R. Evid. 401. Moreover, the Defendant has shown no prejudice. An error does not require reversal unless it affirmatively appears to have affected the result of the trial on the merits. See Tenn. R. Crim. P. 52(a). Based on our review of the record, we conclude that any error in failing to redact the Defendant's statement was harmless.

Next, the Defendant asserts that the trial court should have granted a mistrial because Detective Tillery of the Chattanooga Police Department remarked that after learning the Defendant

was a possible suspect, he "proceeded on pulling up Mr. Harris' record." The Defendant immediately objected and requested a mistrial because the trial court had previously ruled that the Defendant's prior criminal record was inadmissible. During a jury-out hearing, Det. Tillery was permitted to clarify that he meant he pulled the Defendant's driver's license record in order to get an address for the Defendant. The trial court accredited Det. Tillery's testimony, determined that the clarification placed the testimony in a different light, and denied a mistrial. When the jury was brought back in, Det. Tillery clarified for the jury that he meant he pulled the Defendant's driver's license history to find the Defendant's address.

The decision of whether the grant a mistrial is a matter within the discretion of the trial court, and we will not disturb the trial court's action on appeal absent an abuse of that discretion. State v. Millbrooks, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991). Generally, a mistrial will only be declared "if there is a manifest necessity requiring such action by the trial judge." Arnold v. State, 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977). "If it appears that some matter has occurred which would prevent an impartial verdict from being reached, a mistrial may be declared." Id.

We find no "manifest necessity" for a mistrial here. While Det. Tillery's initial comment, standing alone, may have indicated to the jury that the Defendant had a prior criminal record, we believe that any prejudice was remedied when Det. Tillery clarified that he meant he pulled the Defendant's driver's license history. Because no evidence of the Defendant's prior record was before the jury, we cannot find that the statement prevented an impartial verdict from being reached.

Finally, the Defendant asserts that the cumulative effect of these alleged errors mandates a reversal of his conviction. We disagree. We are unable to find any prejudice to the Defendant due to the errors alleged by the Defendant. A conviction will not reversed on appeal absent errors which affirmatively appear to have affected the result of the trial on the merits. See Tenn. R. Crim. P. 52(a); Tenn. R. App. P. 36(b). Thus, any error in admitting this evidence was harmless.

### III. TESTIMONY OF MEDICAL EXAMINER

The Defendant asserts that the trial court erred by refusing to let him ask Dr. Frank King, the Hamilton County Medical Examiner, whether an ordinary and reasonable person would be aware that one blow to the head could cause death. Dr. King testified at trial that the victim died of blunt force trauma to the head. He further testified that it is difficult to predict what injury might be caused by a push or blow to the head; what might cause death in one person might not cause any serious injury to another person. However, when defense counsel asked Dr. King whether an ordinary person would be aware that a hit to the head might actually cause death, the trial court sustained the State's objection. The Defendant now asserts that Dr. King should have been permitted to convey his opinion regarding whether an ordinary and reasonable lay person, as viewed from the accused's standpoint, would be aware that one blow to the head could cause death. We disagree.

Tennessee Rule of Evidence 702 governs testimony of expert witnesses, and it provides, "If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to

understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." Qualifications, admissibility, relevancy, and competency of expert testimony are matters within the discretion of the trial court, and the trial court's discretion will not be disturbed absent an abuse of that discretion. State v. Ballard, 855 S.W.2d 557, 562 (Tenn. 1993).

The trial court determined that the question of whether an ordinary and reasonable person would know that a single blow to the head could cause death called for speculation outside Dr. King's area of expertise. We agree. Dr. King was certified as an expert in forensic pathology. The question asked by the Defendant did not relate to the field of forensic pathology. In fact, it did not call for an expert scientific, technical, or specialized opinion at all. The issue of whether an ordinary and reasonable person would be aware that a single blow to head could cause death was a matter within the purview of the jury, which consisted of ordinary persons. Because the jury could decide for itself what an ordinary and reasonable person would know about the consequences of a blow to the head, the proposed testimony of Dr. King would not "substantially assist" the jury in understanding the evidence. Accordingly, we find no error on the part of the trial court in sustaining the State's objection to this testimony.

## IV.  JURY INSTRUCTIONS

In his fourth issue, the Defendant contends that the trial court erred by granting, in part, the State's requests for special jury instructions on the issues of causation and intent. Regarding causation, the trial court gave the following special instruction: "One who unlawfully inflicts a dangerous wound upon another is held for the consequences flowing from such injury, whether the sequence be direct or through the operation of intermediate agencies dependent upon and arising out of the original cause." The trial court also granted the State's request for the following instruction regarding reckless conduct: "The definition of 'reckless' conduct provides liability for conscious risk creation where there is no desire that the risk occur or no awareness that it is practically certain to occur." The Defendant asserts that these instructions "empowered the jury to convict him for behavior that was completely unintentional and unknowing" and that the trial court "in essence turned reckless homicide into a strict liability crime." We disagree.

A defendant has a constitutional right to a complete and correct charge of the law. State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990). In determining whether jury instructions are erroneous, this Court must read the entire charge and invalidate it only if, when read as a whole, it fails to fairly submit the legal issues or misleads the jury as to the applicable law. See State v. Vann, 976 S.W.2d 93, 101 (Tenn. 1998); State v. Phipps, 883 S.W.2d 138, 142 (Tenn. Crim. App. 1994).

Looking at the jury instructions as a whole, we conclude that the charge fairly submitted the legal issues to the jury, and it did not mislead the jury. When the parties were discussing the proposed jury instructions with the trial judge, the judge expressed concern about the jury becoming confused as to whether the Defendant caused Charles Freeman's death if the jury concluded that Mr. Freeman's death resulted from injuries received when his head struck the pavement rather than

injuries received when his head was struck by the Defendant. The trial judge then decided to give an instruction which was approved by our supreme court in the case of State v. Vann. See Vann, 976 S.W.2d 93, 101. That instruction included the special request by the State and stated as follows:

> Cause of death. Before the defendant can be convicted of any degree of homicide the state must have proven beyond a reasonable doubt that the death of the deceased, Charles Freeman, was brought about as a result of the criminal agency of the defendant. That is, that the defendant -- death of the deceased was due to the unlawful act of the defendant. One who unlawfully inflicts a dangerous wound upon another is held for the consequences flowing from such injury whether the sequence be direct or through the operation of intermediate agencies dependent upon and arising out of the original cause.
>
> To convict the defendant it is not necessary that his act or failure to act be the sole cause, nor the most immediate cause of death, it is only necessary that the defendant unlawfully contributed to the death of the deceased.
>
> If you find the defendant's acts, if any, did not unlawfully cause or contribute to the death of the deceased or if you have a reasonable doubt as to this proposition, then you must acquit him.

We conclude that this instruction properly informed the jury that it must find, beyond a reasonable doubt, that the Defendant's actions caused the victim's death. See id.

Likewise, the jury was properly informed of the definition of reckless conduct. The complete jury instruction regarding reckless conduct read as follows:

> [A] person acts recklessly if that person is aware of and consciously disregards a substantial and unjustifiable risk either, one, that a particular result will occur, or two, that a particular circumstance exists. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint.
>
> Reckless conduct makes a person liable for conscious risk creation where there is no desire that the risk occur or no awareness that it is practically certain to occur. The requirement of recklessness is also established if it shown that the person acted intentionally or knowingly.

The first part of this instruction was taken directly from the statutory definition of "reckless," and the second part of the instruction was taken directly from the sentencing commission comments to the statute. See Tenn. Code Ann. § 39-11-302(c). The instruction was a proper statement of the law, and it did not serve to confuse or mislead the jury. On the contrary, we believe that the added instruction, taken from the sentencing commission comments, helped distinguish reckless conduct from intentional conduct or knowing conduct, which were also defined for the jury. At no time did the instruction make the crime of reckless homicide a strict liability crime. Rather, the instruction

informed the jury that even if the Defendant did not intentionally or knowingly kill Charles Freeman, he would be guilty of reckless homicide if he consciously created and consciously disregarded a substantial and unjustifiable risk that Mr Freeman's death would the be result of his conduct. The jury was repeatedly informed that it must determine the Defendant's guilt beyond a reasonable doubt. Thus, we find no error.

## V. SUFFICIENCY OF THE EVIDENCE

The Defendant argues that the evidence was insufficient to support the verdict. Tennessee Rule of Appellate Procedure 13(e) prescribes that "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." Evidence is sufficient if, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979). In addition, because conviction by a trier of fact destroys the presumption of innocence and imposes a presumption of guilt, a convicted criminal defendant bears the burden of showing that the evidence was insufficient. McBee v. State, 372 S.W.2d 173, 176 (Tenn. 1963); see also State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992) (citing State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1976), and State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977)); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982); Holt v. State, 357 S.W.2d 57, 61 (Tenn. 1962).

In its review of the evidence, an appellate court must afford the State "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." Tuggle, 639 S.W.2d at 914 (citing State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978)). The court may not "re-weigh or re-evaluate the evidence" in the record below. Evans, 838 S.W.2d at 191 (citing Cabbage, 571 S.W.2d at 836). Likewise, should the reviewing court find particular conflicts in the trial testimony, the court must resolve them in favor of the jury verdict or trial court judgment. Tuggle, 639 S.W.2d at 914.

To prove that the Defendant was guilty of the offense of reckless homicide, the State was required to prove that the Defendant recklessly killed Charles Freeman. See Tenn. Code Ann. § 39-13-215. As defined by statute,

> "[r]eckless" refers to a person who acts recklessly with respect to circumstances surrounding the conduct or the result of the conduct when the person is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint.

Id. § 39-11-302(c). The Defendant admittedly hit Mr. Freeman once in the head, causing injuries which resulted in Mr. Freeman's death. Although he asserts that he did so in self-defense, the jury

was at liberty to reject his assertion, especially in light of Essie Freeman's testimony that her son never touched the Defendant prior to the Defendant hitting Charles Freeman on the head. We acknowledge that the State's proof was not overwhelming. Looking at the evidence in the light most favorable to the State, however, we believe that any rational juror could have concluded that the Defendant was aware of but consciously disregarded the substantial and unjustifiable risk that his conduct would cause Mr. Freeman's death. Thus, we conclude that the evidence is sufficient to support the conviction.

## VI. SENTENCING

Finally, the Defendant challenges the sentence imposed by the trial court. The trial court sentenced the Defendant to six years incarceration as a Range II, multiple offender. When an accused challenges the length, range, or manner of service of a sentence, this Court has a duty to conduct a de novo review of the sentence with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).

When conducting a de novo review of a sentence, this Court must consider: (a) the evidence, if any, received at the trial and sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) any statutory mitigating or enhancement factors; (f) any statement made by the defendant regarding sentencing; and (g) the potential or lack of potential for rehabilitation or treatment. State v. Thomas, 755 S.W.2d 838, 844 (Tenn. Crim. App. 1988); Tenn. Code Ann. §§ 40-35-102, -103, -210.

If our review reflects that the trial court followed the statutory sentencing procedure, that the court imposed a lawful sentence after having given due consideration and proper weight to the factors and principles set out under the sentencing law, and that the trial court's findings of fact are adequately supported by the record, then we may not modify the sentence even if we would have preferred a different result. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

The presumptive sentence for a Class B, C, D, or E felony is the minimum sentence in the range if there are no enhancement or mitigating factors. Tenn. Code Ann. § 40-35-210(c). In determining the appropriate sentence, the trial court is to start at the presumptive sentence in the range, increase the sentence within the range as appropriate for enhancement factors, and then decrease the sentence within the range as appropriate for mitigating factors. Id. § 40-35-210(e).

Because the Defendant was a Range II, multiple offender, the sentence range for this Class D felony was four to eight years. See id. § 40-35-112(b)(4). The trial court sentenced the Defendant to a mid-range sentence of six years, after finding the presence of two enhancement factors and two mitigating factors. The court determined, however, that the enhancement factors outweighed the

mitigating factors. On appeal, the Defendant asserts that the trial court erred by applying one of the enhancement factors and that the trial court should have considered other mitigating factors.

The Defendant does not challenge the application of enhancement factor (1), that the Defendant has a history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range. See id. § 40-35-114(1). However, he asserts that statutory enhancement factor number (11), that the felony resulted in death or bodily injury or involved the threat of death or bodily injury to another person and the Defendant has previously been convicted of a felony that resulted in death or bodily injury, should not have been applied because death or bodily injury is an element of the offense. See id. § 40-35-114(11). We agree that death is an element of reckless homicide, but the additional requirements of this enhancement factor, that the Defendant has previously been convicted of a felony that resulted in death or bodily injury, are not elements of reckless homicide. Therefore the enhancement factor itself is not an element of the offense. The proof established that the Defendant had previously been convicted of two counts of aggravated assault due to his actions of shooting two people. Thus, we conclude that this enhancement factor was properly applied.

The trial court applied as mitigating factors (1) that the Defendant expressed remorse for his actions and (2) that the Defendant had made strides toward improving himself while being incarcerated. See id. § 40-35-113(13). The Defendant asserts that the trial court should have applied the following additional factors: (1) the Defendant, although guilty of the crime, committed the offense under such unusual circumstances that it is unlikely that a sustained intent to violate the law motivated his conduct; (2) the Defendant acted under strong provocation; (3) substantial grounds exist tending to excuse or justify the Defendant's criminal conduct though failing to establish a defense; (4) the Defendant was motivated by a desire to provide necessities for his family; and (5) the Defendant is of low intelligence. See id. § 40-35-113(2), (3), (7), (11), (13). Although the trial court considered these factors, it determined that they were not applicable. We agree.

We can find no evidence in the record regarding the Defendant's intelligence, and while the Defendant testified that he was arguing with Mr. Freeman about money, there was no proof that the Defendant was motived by a desire to provide necessities for his family. Additionally, we find no evidence of strong provocation. Granted, there was proof that the Defendant and Mr. Freeman were arguing, and the Defendant in his statement asserted that he was acting in self-defense; however, the State's proof established that the Defendant struck Mr. Freeman without first being touched by Mr. Freeman. Furthermore, the only evidence of justification was that the Defendant was acting in self-defense, and that evidence was refuted by the State's proof. In addition, the Defendant's prior record, which includes multiple assault convictions, tends to negate any assertion that the offense was committed under such unusual circumstances that it was unlikely a sustained intent to violate the law motivated the Defendant's conduct. Accordingly, we find no error on the part of the trial court in refusing to apply these mitigating factors. The mid-rage sentence was therefore appropriate due to the presence of two enhancement factors which outweighed the two mitigating factors.

The Defendant also contends that he should have been granted an alternative sentence rather than having to serve his sentence in incarceration. His argument, however, is based on his assertion that he is entitled to the presumption of alternative sentencing. A defendant who is an especially mitigated or standard offender convicted of a Class C, D, or E felony is presumed to be a favorable candidate for alternative sentencing options in absence of evidence to the contrary. Id. § 40-35-102(6). While reckless homicide is a Class D felony, the Defendant is a Range II, multiple offender. Thus, the presumption of alternative sentencing is inapplicable. Considering the principles of sentencing established by the legislature, we agree with the trial court that a sentence of incarceration was appropriate. Recognizing the limited capacity of prison facilities, the legislature has maintained that convicted felons "possessing criminal histories evincing a clear disregard for the laws and morals of society, and evincing failure of past efforts at rehabilitation shall be given first priority regarding sentencing involving incarceration." Id. § 40-35-102(5). The trial court was faced in this case with a Defendant who has a long history of criminal conduct spanning ten years and who has multiple convictions for violent conduct. See id. § 40-35-103(1)(A). Despite numerous convictions, the Defendant has not been deterred from committing crimes. See id. § 40-35-103(1)(C). We thus find no error in the sentence imposed by the trial court.

The judgment of the trial court is affirmed.

_____
DAVID H. WELLES, JUDGE

-13-